COMMISSION ON INDEPENDENT COL-
LEGES AND UNIVERSITIES, individu-
ally and on behalf of its member institu-
tions, Henry D. Paley, individually and
as President of the Commission on Inde-
pendent Colleges and Universities,
James C. Ross, individually and as Vice-
President of the Commission on Inde-
pendent Colleges and Universities, Leon
Botstein, Charles J. Lavery, Edward J.
Mortola, Joseph C. Palamountain, James
Shuart and Dorothy Ann Kelly, Plain-
tiffs,

v.

The NEW YORK TEMPORARY STATE
COMMISSION ON REGULATION OF
LOBBYING, Walter J. Mahoney, Gail L.
Hellenbrand, S. Stanley Kreutzer, Har-
vey M. Lifset, individually and in their
capacity as members of New York Tem-
porary State Commission on Regulation
of Lobbying and Frederick C. Stimmel,
individually and in his capacity as Exec-
utive Director New York Temporary
State Commission on Regulation of Lob-
bying, Defendants.

No. 81–CV–105.

United States District Court,
N. D. New York.

March 10, 1982.

Laverne, Sortino, Hanks & Lustig, Albany, N. Y., for plaintiff; Thomas Laverne, Albany, N. Y., of counsel.

Robert Abrams, Atty. Gen., State of N. Y., Albany, N. Y., for defendants; Lance A. Russell, Albany, N. Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

The Commission on Independent Colleges and Universities [CICU], the President and Vice-President of that organization, and the individual plaintiffs challenge the New York Regulation of Lobbying Act [lobby

law]. N.Y. Leg. Law §§ 1–16. The defendants are the New York Temporary State Commission on Regulation of Lobbying [Commission], its Executive Director and its individual members.

Plaintiffs seek a declaratory judgment that the lobby law is, "in its entirety, null and void, unconstitutional and of no force and effect." Plaintiffs also request an injunction restraining the "defendants, their successors, and all persons acting under their discretion, from enforcing, or attempting to enforce the Regulation of Lobbying Act or from advising, instituting, prosecuting or aiding in any action, suit or proceeding ... to impose upon or enforce against plaintiffs, their officers, agents or employees or any of them, any penalty or damage for failure or refusal to observe or comply with the provisions of said Act." (Plaintiffs' Amended Complaint A, B).

Jurisdiction is predicated upon 28 U.S.C. §§ 1343, 2201 et seq., and 42 U.S.C. § 1983. Now before this Court are the plaintiffs' motion for summary judgment pursuant to Rule 56 of the Fed.R.Civ.P., and the defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Fed.R.Civ.P.

## I.

## BACKGROUND

Plaintiff CICU is a corporation organized under the Education Law of the State of New York, N.Y. Educ. Law § 237. The individual plaintiffs Paley and Ross are officers of CICU and plaintiffs Botstein, Palamountain, Kelly, Shuart, Mortola and Lavery are presidents of CICU members institutions. The defendants are responsible for the enforcement of the lobby law. N.Y.Leg. Law §§ 4(c)(1), 15.

On June 14, 1979, the Commission advised CICU by letter that if CICU determined "that any person, firm, corporation, or association (lobbyist) is or has been retained, employed or designated to lobby for CICU or any independent college or university

and reaches or anticipates reaching the $1,000 threshold, it would be necessary for such lobbyist to immediately register and report to the Commission." (Plaintiffs' Exhibit "C"). In compliance therewith, CICU, its member institutions, and its members registered as lobbyists under protest.

In connection with the plaintiffs' motion for summary judgment, the parties have filed statements of material facts as to which they contend there is no genuine issue to be tried. Rule 10(c) of the General Rules of the United States District Court for the Northern District of New York. From those statements the Court finds it undisputed that compliance with the lobby law entails recordkeeping and accounting efforts,[1] and that the State University of New York (SUNY) and the City University of New York (CUNY) are exempt from the jurisdiction of the defendant Commission.[2] The parties disagree as to the scope of the law's effects on first amendment rights.

The lobby law defines a "lobbyist" as

every person, firm, corporation or association retained, employed or designated by any person, firm, corporation or association, or by any public corporation, who, on behalf of such entity and pursuant to such retainer, employment or designation, attempts to influence the passage or defeat of any legislation by either house of the legislature, or the approval or disapproval of any legislation by the Governor, or the adoption or rejection of any rule having the force or effect of law, or the outcome of any rate-making proceeding by a state agency.

N.Y.Leg. Law § 3(a). The term "lobbying" or "lobbying activities" is defined as

attempts to influence the passage or defeat of legislation by either house of the legislature, approval or disapproval of any legislation by the Governor, or the adoption or rejection of any rule or regulation having the force and effect of law,

---

1. Sections 8 and 10 require registration and periodic reporting of lobby income and expenses.

2. N.Y.Leg. Law § 12(a)(2).

or the outcome of any ratemaking proceeding in a state agency. N.Y.Leg. Law § 3(b).

Every lobbyist must file an annual statement of registration that includes the name and address of the lobbyist, the lobby for which the lobbyist is retained, employed or designated, a copy of any agreement if written, or a statement of the terms of the retainer, employment or designation, a description of the subjects of the lobbying, and the agencies that will be lobbied. If the lobbyist is retained by more than one lobby a separate statement for each lobby must be submitted. N.Y.Leg. Law § 5.

Lobbyists are required to file quarterly and annual reports with the Commission. A lobbyist who receives or incurs at least $1,000 of reportable expenditures in a year must register and file the first periodic report by the fifteenth day after the reporting period on which the cumulative total expended for lobby reaches $1,000. N.Y. Leg.Law § 8(a)(1). Thereafter, a quarterly report must be filed if the lobbyist receives, expends or incurs at least $250 for the purposes of lobbying during the quarter. N.Y.Leg.Law § 8(a)(2). The annual reports are to cumulate information provided in periodic reports, or are to provide equivalent information if periodic reports are not required. N.Y.Leg.Law § 10(b)–(d).

Expenses under $50 are detailed in the aggregate. Expenses over $50 must be reported separately and detailed as to who paid and for what purpose, and must be substantiated by receipts. The term "expenses" does not include the personal sustenance, lodging or travel disbursements of the lobbyist, or expenses under $500 for one calendar year incurred for printing or other means of reproduction. N.Y.Leg.Law § 8(b)(5).

The law does not apply to persons engaged in the drafting of legislation, rules, regulations, or rates; or to advising clients and rendering opinions on proposed legislation, rules, regulations or rates, where such professional services are not otherwise connected with legislative or executive action on such legislative or administrative action

or rules, regulations or rates. N.Y.Leg.Law § 12(a)(1). The State of New York, including its officers, employees, counsels, or agents, when acting in their official capacity are also exempt from the law. N.Y. Leg.Law § 12(a)(2). The media, and the owners and employees of the media are exempt provided that their activities are limited to the publication or broadcast of news items, editorials, and paid advertisements in connection with proposed legislation, rules, regulations and rates. N.Y. Leg.Law § 12(a)(3). Persons appearing before legislative committees, open meetings, or public meetings are also excluded from compliance. N.Y.Leg.Law § 12(a)(4).

Provision is made for both civil and criminal penalties for a wilful violation of the law. N.Y.Leg.Law § 13(a), (b). All statements or reports filed under the act are made under the penalty of perjury. N.Y. Leg.Law § 14(a). Upon receipt of notice from the Commission that a person or entity has failed to file a required report, the Attorney General or other appropriate authority "shall take such action as he deems appropriate to secure compliance...." N.Y.Leg.Law § 14(b)(3).

Plaintiffs challenge this legislation on the grounds that it is an overbroad restriction of their First Amendment rights of freedom of speech, petition and association, that it is void for vagueness, and that it denies equal protection under the First and Fourteenth Amendments.

## II.

### DEFENDANTS' MOTION TO DISMISS

The defendants have moved to dismiss the complaint under Rule 12(b)(6), for failure to state a claim upon which relief can be granted. A Rule 12(b)(6) motion tests the legal sufficiency, as opposed to the factual basis of a claim. *Lowenschuss v. Kane*, 520 F.2d 255, 262 (2d Cir. 1975); *Oneida Indian Nation of New York v. State of New York*, 520 F.Supp. 1278, 1308 (N.D.N.Y. 1981). *See also*, Wright & Miller, *Federal Practice and Procedure: Civil*, § 1356; 2 A Moore's *Federal Practice*, ¶ 12.08. The is-

sue in this motion, then, is not whether the plaintiffs will prevail on the merits of their claim, but rather whether plaintiffs are entitled to offer evidence in support of their claim. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Clay v. Martin*, 509 F.2d 109 (2d Cir. 1975). *See also* Wright & Miller, *supra.* The Court is required to accept the plaintiffs' factual allegations as true. *Scheuer v. Rhodes, supra,* 416 U.S. at 236, 94 S.Ct. at 1686; *Conley v. Gibson, supra,* 355 U.S. at 45–46, 78 S.Ct. at 106; *Oneida Indian Nation of New York v. State of New York, supra* at 1308.

■ The Court finds that the allegations regarding the scope of this law, as set forth in plaintiffs' complaint, if taken as true, are sufficient to support a finding of constitutional violation. Therefore, the defendants' motion to dismiss the complaint is denied.

### III.

### PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### OVERBREADTH

The primary claim advanced by the plaintiffs is that this statute is void because it restricts the exercise of First Amendment constitutional rights of speech, petition, and association. A law will be struck down for overbreadth when "it does not aim specifically at evils within the allowable area of government control ..., but sweeps within its ambit other activities that constitute an exercise" of protected expressive or associational rights. *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940).

■ Laws which purport to regulate the content or quantum of speech must be strictly scrutinized by the courts. Unless a compelling governmental interest is present that justifies such restrictions, the law will be invalidated. *See, e.g., Consolidated Edison Company of New York v. Public Service Comm'n of New York*, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (law pro-

hibiting utilities from inclusion of billing inserts that discuss controversial issues); *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (law prohibiting corporations and banks from efforts to influence state referenda). *See also, Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Gooding v. Wilson*, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed. 284 (1971); *Brandenburg v. Ohio*, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942). In such cases it is not necessary for a party to show that his own conduct is constitutionally protected, rather, the party must only show that there are other factual contexts in which the statute would limit protected speech. *Central Hudson Gas Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 565 n. 8, 100 S.Ct. 2343, 2351 n. 8, 65 L.Ed.2d 341 (1980); *Dombrowski v. Pfister*, 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965); *Kunz v. New York*, 340 U.S. 290, 294, 71 S.Ct. 312, 315, 95 L.Ed. 280 (1951).

However, not every interference with fundamental constitutional rights will be struck down by the courts. *See e.g., Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618; *Califano v. Jobst*, 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1978).

The Supreme Court has developed a distinction to be observed in making an analysis of a statute's overbreadth. *Broadrick v. Oklahoma*, 413 U.S. 601, 612–13, 93 S.Ct. 2908, 2915–16, 37 L.Ed.2d 830 (1973). *Broadrick* differentiated between laws which are straightforward regulations of the content or quantum of speech and those which seek to regulate conduct and have an incidental impact on First Amendment rights. *Compare Gooding v. Wilson, supra; Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Zwickler v. Koota*, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); *Shelton v. Tucker*, 364 U.S. 479, 81

S.Ct. 247, 5 L.Ed.2d 231 (1960) *with United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954) (upholding lobby disclosure law); *United States v. CIO*, 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948).

In *Broadrick* the Supreme Court stated that voiding a law for overbreadth is "strong medicine" that has only been applied as a last resort. 413 U.S. at 613, 93 S.Ct. at 2916. The Court observed that

> facial overbreadth adjudication is an exception to the traditional rules of practice, and its function a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the state to sanction moves from "pure speech" toward conduct... [P]articularly where conduct and not merely speech is involved, we believe that the overbreadth must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.

*Id.* at 615, 93 S.Ct. at 2917. In addition, *Broadrick* teaches specifically that lobby disclosure laws are traditionally subject to less scrutiny than laws that sanction "pure speech". *Id.* at 613, 93 S.Ct. at 2916.

■ The Supreme Court has had occasion to address itself to the overbreadth doctrine in regard to disclosure requirements contained in the Federal Election Campaign Act, 2 U.S.C. § 431 *et seq. Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The Court held that disclosure requirements present a different question than actual limits on the amount of money that can be contributed to political campaigns. *Id.* at 64, 96 S.Ct. at 656. Nonetheless, the Court held that, even though disclosure requirements do not place direct limits on speech, compelled disclosure may impinge on First Amendment rights. *Id. See, e.g., Gibson v. Florida Legislative Comm.*, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Shelton*

*v. Tucker, supra.* Any significant encroachment on constitutional rights must be justified by more than a showing of a mere rational or legitimate interest, rather there must be subordinating interest furthered by the legislation. *Buckley v. Valeo, supra* 424 U.S. at 64–65, 96 S.Ct. at 656; *Bates v. Little Rock*, 361 U.S. 516, 525, 80 S.Ct. 412, 417–18, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama*, 357 U.S. 449, 461, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958); *Kusper v. Pontikes*, 414 U.S. 51, 57–58, 94 S.Ct. 303, 307–08, 38 L.Ed.2d 260 (1973). Once a subordinating interest is found, the Court must analyze whether the government has chosen means that actually further that interest. *Buckley v. Valeo, supra* 424 U.S. at 64–65, 96 S.Ct. at 656. *See also Citizens against Rent Control v. City of Berkley*, —— U.S. ——, ——, 102 S.Ct. 434, 437, 70 L.Ed.2d 492 (1981).

■ The *Buckley* Court found the important government interests involved in the FECA disclosure law sufficient to outweigh the possibility of a chill on First Amendment rights. *Buckley v. Valeo*, 424 U.S. at 66, 96 S.Ct. at 659. Governmental interests which go to the heart of the "free functioning of the nation's institutions" can overbalance the abridgement of constitutional rights. *Id. citing, Communist Party v. Subversive Activities Control Board*, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).

The important government interests involved in FECA were: providing the public with information regarding the source of campaign funds, deterring corruption and the appearance of corruption, and detecting violations of the FECA campaign spending limitations. *Buckley v. Valeo, supra* 424 U.S. at 67–68, 96 S.Ct. at 657–58.

It appears that the New York lobby law was promulgated along lines of reasoning fundamentally similar to those used as a justification for the disclosure provisions of FECA.[3] The lobby law serves to apprise the public of the sources of pressure on

---

**3.** The last stated purpose in *Buckley*, namely detecting violations of FECA campaign spending limits, is not applicable to the instant case, however, since there are no spending limits in the New York lobby law.

government officials, thus better enabling the public to access their performance.[4]

Further, it appears that the New York lobby law is consciously patterned after the federal scheme enacted by Congress in the Federal Regulation of Lobbying Act, 2 U.S.C. §§ 261–270 [FRLA]. Neither law limits the amount or kind of lobbying that can be undertaken, but does provide that lobbyists must register, disclose the identity of their employers, and submit periodic reports of income and expenses.[5]

Lobbying is defined in the FRLA as any attempt to "influence, directly or indirectly, the passage or defeat of any legislation by the Congress of the United States." 2 U.S.C. § 266. There, as here, the law was challenged for overbreadth and vagueness. The Supreme Court, in upholding the constitutionality of the FRLA stated that Congress could require disclosure of lobbying as it is commonly defined, namely as direct communications with members of Congress by the lobbyists themselves, or through an artificially stimulated letter campaign.[6] *United States v. Harriss*, 347 U.S. 612, 615, 620, 74 S.Ct. 808, 810, 813, 98 L.Ed. 989 (1954).

The *Harriss* Court held that the disclosure provisions in the FRLA were constitutional because the Congressional purpose there justified the infringement of free speech and right to petition that necessarily resulted therefrom. The Court stated that

[p]resent day legislative complexities are such that individual members of Congress cannot be expected to explore the myriad pressures to which they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small part on their ability to properly evaluate such pressures.... Congress has not sought to prohibit these pressures. It has merely provided for a modicum of information from those who for hire, attempt to influence legislation, or who collect or spend funds for that purpose.

*Id.* at 625, 74 S.Ct. at 816.

The Court recognized that disclosure may, as a practical matter, act as a deterrent to the exercise of First Amendment rights. Even on the assumption that the Court's "narrow" construction of the act restrained the exercise of these rights, the Court observed that such fears are too remote to require invalidation of the Act because such deterrence is "at most an indirect one resulting from self-censorship." *Id.* at 626,[7] 74 S.Ct. at 816.

Plaintiffs' claim that the New York lobby law must be invalidated for overbreadth because: (1) it reached "indirect" lobbying activities (allegedly held unconstitutional by the Supreme Court in *Harriss*); (2) its "chilling effect" is not outweighed by the subordinating interest of the government; (3) the $1,000 threshold is impractical and makes it unworkable; (4) it has application

**4.** *See, e.g.*, § 1; Memorandum in Support, Plaintiffs' Exhibit "F", Defendants' Exhibit "2", attached to Russell affidavit [hereinafter cited as Memorandum in Support]; Letter of Steingut, 4, Defendants' Exhibit "A" attached to Defendants' Brief [hereinafter cited as Letter of Steingut]; Assembly Floor Debate, July 7, 1977, Plaintiffs' Exhibit "N", 9761–9764 [hereinafter cited as Assembly Debate]. Exposing such activities to public scrutiny is considered beneficial because "informed public opinion is the most potent force of all restraints on misgovernment", *Grosjean v. American Press Co.*, 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936), *cited* in *Buckley v. Valeo*, 424 U.S. at 67, n. 79, 96 S.Ct. at 657 n. 79.

**5.** *Compare* 2 U.S.C. §§ 264, 267 *with* N.Y. Leg.Law §§ 8, 10. *See also, Memorandum in*

Support, *supra*, Letter of Steingut, *supra* ; Assembly Debate, *supra* at 9741–46.

**6.** An artificially stimulated letter campaign is defined as "initiating propaganda", *i.e.*, a campaign to stimulate the public to directly contact legislators by letters or telegrams, etc. *United States v. Harriss, supra* at 621 n. 10, 74 S.Ct. at 813 n. 10.

**7.** The *Harriss* Court emphasized the fact that Congress had not sought to curtail lobbying. Rather, the FRLA merely provided that a lobbyist give information as to "who is putting up the money, and how much." *United States v. Harriss, supra* 347 U.S. at 625, 74 S.Ct. at 816. Congress acted with similar purpose in enacting the Federal Corrupt Practices Act. (*formerly codified at* 2 U.S.C. §§ 241–248, *replaced by* FRCA, 2 U.S.C. §§ 431 *et seq.*).

to agency lobbying; and (5) the supportive legislative record is deficient.

### 1. *"Direct" vs. "Indirect" Lobbying*

Plaintiffs aver that the New York legislature's failure to state specifically that only direct contact with government officials in order to influence legislation can be labelled "lobbying" signifies that any action which could conceivably impact upon government action, no matter how remote, is to be considered "lobbying" under the New York law. Plaintiffs apparently concede that CICU's lobbying activities involve direct contact with government officials in attempting to influence legislation and agency action. *See* Plaintiffs' Brief, III.–IV. However, the individual presidents of independent colleges interpret the act to apply to *any* discussion of the merits of any governmental action that *may* ultimately affect or influence such action. Consequently, these plaintiffs claim that they feel compelled to curtail any public discussions or communications in order to avoid triggering the disclosure provisions of the lobby law. The plaintiffs contend that the lobby law's definition of lobbying activities has a chilling effect on them and upon other organizations concerned with proposed legislation resulting in their compelled silence so as to avoid the onerous record-keeping requirements contained in the Act.

If the foregoing constituted a realistic appraisal of the scope of New York lobby law, this Court would agree with plaintiffs that it should be struck down as overbroad. However, since this Court believes that the legislation, when put in its proper context, was never meant to, and in practice, never will reach such activities, the Court declines to invalidate the law for overbreadth in that regard.

At the outset, the Court notes that *Harriss* did not hold that *only* direct contact with government officials could be regulated by a disclosure law. The Court held that indirect lobbying, in the form of campaigns to exhort the public to send letters and telegrams to government officials, could be included within the definition of lobbying activities. *United States v. Harriss, supra* at 621 n.10, 74 S.Ct. at 813–10.

Plaintiffs claim that the legislative history of the New York lobby law indicates an intention to include *any* conceivable attempt to influence government action. In support of this proposition plaintiffs selected quotes from the Assembly debate. *See* Assembly Debate, *supra*. It appears, however, that when these quotes are placed in the context of the entire debate, that the legislature wished to incorporate the *Harriss* definition of lobbying activities.[8]

---

**8.** 1) Di Carlo: "If I get together with another person and put an ad in the New York Times, and I say that I think it is terrible that the Legislature wants to pass a Blue Law... If I do it on behalf of five people, and we get together. We think this is bad for his business, and my business, and we want to let the public know what is going on, am I a lobbyist?"

Zimmer: "If you are doing this on behalf of other people, yes, you are a lobbyist, or a group of other people, you are a lobbyist."
Plaintiffs' Brief, p. 27, Assembly Debate, *supra* at 9740. On its face the quote indicates that an advertisement discussing the merits of pending legislation would be included in the definition of lobbying. However, as the discussion narrowed it became clear that Mr. Zimmer was trying to differentiate between advertisements that discuss the merits of legislation and those which can be classified as part of an artificially stimulated letter campaign as evidence by the following exchange:

Mr. Di Carlo: That does not say that the mere placing of ads comes within this section, does it?
Mr. Zimmer: It depends upon what the ad says.
Assembly Debate, 9745. (Mr. Zimmer was chief sponsor of the bill).
2) Di Carlo: "If a church group advertising in the newspaper says, 'We think that is a rotten bill that the Legislature is passing, and it should be defeated, period' spends $2,500 on the ad, are they lobbyists under this bill?"
Siegel: "I would think so."
Di Carlo: "And they would have to register as lobbyists?"
Siegel: "I would think so."
(Mr. Siegel led the floor debate on behalf of the Farber Bill.)
3)c) Schumer: "Say I decide on my own or in conjunction with somebody else, as a citizen, not a legislator, to put up a $1,500 billboard to say, 'Please urge your legislator to vote for a certain bill,' and I never talked to a legislator, never saw him, and never made a

■ It should also be noted that the defendant Temporary Commission has issued an advisory opinion which reflects that the lobby law will not be applied in any context outside the definition of lobbying contained in the *Harriss* case. Op. 79/1 (Plaintiffs' Exhibit "M"). Agency interpretations regarding the scope of a law are not to be ignored by courts when analyzing the overbreadth of a statute. *Broadrick v. Oklahoma, supra* 413 U.S. at 618, 93 S.Ct. at 2919. Plaintiffs point out that the Temporary Commission's opinions are of an explanatory nature, and do not have the force and effect of law. 1978 Op. of Attorney General, 63–64. However, since the Temporary Commission is charged with the enforcement of the law such distinction is chimerical.

In sum, there is no indication that this New York legislation requires disclosure of indirect lobbying activities that go beyond those activities enumerated in the *Harriss* decision.

■ This Court, bears in mind that only state courts can authoritatively construe state statutes. *Gooding v. Wilson, supra; United States v. Thirty-Seven Photographs,* 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); *NYCLU v. Acito,* 459 F.Supp. 75 (S.D.N.Y.1978). However, the Court believes that the New York lobby law is fairly susceptible to a constitutional construction. *United States v. Thirty-Seven Photographs, supra* 402 U.S. at 369, 91 S.Ct. at 86. C.f. *Zwickler v. Koota, supra* 389 U.S. at 251, 88 S.Ct. at 397.

■ This Court will not strike down the lobby law based on plaintiffs' argument that it has a wider scope than has actually proven to be the case, since the state legislature and the defendant Temporary Commission that enforces the law have evinced an intent to stay within the constitutional limitations of such a law as outlined in *Harriss.* Also, there is no indication that in the few years that the defendant Commission has enforced the law that there have been any unconstitutional application of it. This Court is not a "roving commission" charged with invalidating laws by straining to find unconstitutional applications. C.f. *Broadrick v. Oklahoma, supra* 413 U.S. at 610–11, 93 S.Ct. at 2915; *Younger v. Harriss,* 401 U.S. 37, 52, 91 S.Ct. 746, 754, 27 L.Ed.2d 669 (1971).

If the plaintiffs still harbor doubts regarding the scope of this legislation, they may test them in state court.

### 2. *Chilling Effect.*

As stated before, it is necessary, when judging the constitutionality of a statute which involves the exercise of First Amendment rights, to weigh the subordinating interest of the government against the chilling effect exerted on the exercise of those rights. *Buckley v. Valeo,* 424 U.S. at 64–65, 96 S.Ct. at 656. *See generally, Smith v. Arkansas State Highway Emp. Local 315,* 441 U.S. 463, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1980); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Abood v. Detroit Bd. of Education,*

---

contribution to the legislator, am I still covered by this bill?"

Siegel: "I think so."
Schumer: "(F)or instance, in conjunction with somebody else over the course of a year, I publish leaflets—I know that happened in my District—$2,000 or $1,501 worth of leaflets, if they said, 'I am against the death penalty.' for this reason am I covered by this bill?"

Siegel: "I think so."
4) Schumer: "For instance, if some tenants decided they wanted to prevent the Co-op Conversion Law, and they got together and put together a booklet on this, and they spent

money for research, and this came to $1,501, are they covered?"
Siegel: "I think so."
Plaintiffs Brief, p. 37–38, Assembly Debate, *supra* at 9748, 9753–54. Again, on the surface, quotes labelled 2, 3(b) and 4, show that this bill reached activities which are too remote to justify lobby disclosure. However, later in the debate Mr. Siegel differentiates between "just preaching" on the merits of legislation, and undertaking a campaign for direct contact with officials, because the "*Harriss* case makes that clear." Assembly Debate, 9748–49. *See also,* Letter of Steingut, *supra,* (explaining that this legislation goes no further than *Harriss* in the definition of lobbying).

431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261, *rehearing den.*, 433 U.S. 915, 97 S.Ct. 2989, 53 L.Ed.2d 1102 (1977); *Perry v. St. Pierre*, 518 F.2d 184 (2d Cir. 1975); *Havas v. Communications Workers of America*, 509 F.Supp. 144 (N.D.N.Y.1980); *Vanasco v. Schwartz*, 401 F.Supp. 87 (S.D.N.Y.1978), *aff'd sub nom*, 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1979).

Laws have been struck down because of their untoward chilling effect, even if, as here, they do not involve a direct limit on the exercise of First Amendment rights. *See e.g., Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); *Baird v. State Bar of Arizona*, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971); *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Baggett v. Bullitt*, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964). The government is obliged to choose the least restrictive means of furthering their interests. *Citizens Against Rent Control v. Berkeley, supra* —— U.S. at ——, 102 S.Ct. at 437–38; *Louisiana ex rel. Gremillion v. NAACP*, 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961); *NAACP v. Alabama, supra; Talley v. California*, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960); *Shelton v. Tucker, supra*.

Plaintiffs advance several arguments by which they purport to show that this law unnecessarily chills First Amendment rights. First and foremost among them is the argument that since disclosure of both direct and indirect attempts to influence governmental decision-making is required, it chills any form of discussion on the merits of proposed legislative, executive or administrative action. As made clear in the foregoing analysis, the New York lobby law only requires that a person or entity, acting on behalf of another, disclose and report the sources and expenses involved in direct communication with government officials to influence legislative and administrative action, or in campaigns to exort the public to make such direct contact as outlined in *United States v. Harriss, supra*.

The plaintiffs also contend that the lobby law should be struck down because of its chilling effect on lobbying. Lobbying, they argue, is not actually a threat to the democratic process, and, in fact, greatly facilitates the government in its decisionmaking processes. The difficulty with this analysis is that the governmental interest involved in lobby disclosure is not really concerned with whether or not lobbying is evil. The governmental interest here is in providing the public and government officials with knowledge regarding the source and amount of pressure on government officials. The legislature has not sought to prohibit any type of lobbying or limit the amount of lobbying that can be undertaken. Other courts have recognized that lobby disclosure laws serve the purpose of providing public information on lobbying activities without unnecessarily restricting the scope of lobbying activities that can be undertaken. *See, e.g., ACLU v. New Jersey Election Law Enforcement Committee*, 509 F.Supp. 1123 (D.N.J.1981); *Advisory Opinion on 1975 PA 227*, 396 Mich. 465, 242 N.W.2d 3 (1976); *Fritz v. Gorton*, 83 Wash.2d 275, 517 P.2d 911 (1974); *Moffett v. Killian*, 360 F.Supp. 228 (1973).

Plaintiffs declare in their affidavits that they engaged in direct legislative contact prior to the enactment of this law. Now, however, since their public policy advocacy is labeled lobbying, and lobbying has a pejorative connotation in the public's perception, they are forced to curtail their activities. The individual plaintiffs believe that if they are tarred with the epithet "lobbyist" they will harm their institutions. Also, since they are paid large salaries an allocation of an even insignificant portion of their time to legislative contact will exceed the $1,000 threshold.

■ The Court believes that the plaintiffs arguments in this regard fall largely into the category of self-censorship as outlined in *United States v. Harriss, supra* 347 U.S. at 626, 74 S.Ct. at 816. There is no factual record of economic reprisals, loss of employment, threats, or other manifestations of hostility in this case as in *NAACP v. Alabama, supra* 357 U.S. at 458–60, 78 S.Ct. at 1170 (1958). *See also Bates v. City*

*of Little Rock; Gibson v. Florida Legislative Comm., supra; Local 814, International Longshoreman's Ass'n,* 667 F.2d 267 (2d Cir., 1981). In weighing the interests involved here and considering the actual scope of this law (as opposed to the plaintiffs' characterization of it), this Court is of the opinion that whatever chilling effect is present is outweighed by the governmental interest in disclosure.

### 3. *$1,000 Threshold.*

■■■ Plaintiffs urge that the $1,000 threshold requirement included in the law ostensibly to separate substantial lobbyists from occasional lobbyists, is impractical in that, in reality, $1,000 is not a substantial amount of money. This Court, however, will not substitute its judgment as to what constitutes the proper threshold amount for lobbying disclosure. As the Supreme Court stated in *Buckley v. Valeo,*

> We cannot require Congress to establish that it has chosen the highest reasonable threshold. The line is necessarily a judgmental decision, best left in the context of this complex legislation to congressional discretion.

424 U.S. at 83, 96 S.Ct. at 665. Once the state has shown, as here, that there is a subordinating interest to be furthered by this legislation, courts should not impose their judgment as to the proper mathematics to be applied. *Id.* at 83 n. 11, 96 S.Ct. at 665 n. 11; *Louisville Gas Co. v. Coleman,* 277 U.S. 32, 48 S.Ct. 423, 72 L.Ed. 770 (1928) (Holmes, J., dissenting).[9]

### 4. *Agency Rule-Making and Rate-Making.*

Plaintiffs claim that the application of the lobby law to agencies whose rule-making powers have the effect of law is unconstitutional. Plaintiffs point out that *Harriss* did not specify that agency action could be included in the terms of a lobby disclosure law. However, the significance of this fact pales when one considers that Congress did not consider agency lobbying in formu-

lating the federal law, and did not include it within that law's terms.

■■■ Certainly, it appears to this Court that agency rules and rates, which have the force and effect of law, have as much impact upon the governed as legislation. Accordingly, the Court finds that the governmental interests justifying the disclosure of lobbying activities directed toward legislation also justify the disclosure of lobbying activities related to agency rule-making and rate-making that have the force and effect of law. At least two states have enacted laws which mandate disclosure of agency lobbying activities. These laws have been upheld by the state courts of last resort. *Fair Political Practices Comm'n v. Superior Court,* 25 Cal.3d 33, 599 P.2d 46, 157 Cal. Rptr. 585 (1979) *cert. denied,* 444 U.S. 1049, 100 S.Ct. 740, 62 L.Ed.2d 736 (1980) (California); *Advisory Opinion on 1975 PA. 227, supra* (Michigan).

### 5. *The Sufficiency of the Legislative Record.*

Plaintiffs claim that this law must be invalidated because there is not a sufficient legislative record to justify the legislation. In their complaint plaintiffs state that "the New York Legislature failed to compile any record demonstrating the inadequacy of the prior statute or the presence of lobbying abuses." (Amended Complaint, ¶ 37). Plaintiffs argue that the primary reason that the Supreme Court sanctioned the federal lobby disclosure law in *Harriss* was the extensive Congressional investigation into lobbying. Plaintiffs aver that since the state legislature did not conduct such an investigation, there can be no important state interest involved that could justify this legislation.

This Court fails to find such a requirement, explicit or implicit, in *Harriss.* While the *Harriss* court referred to the legislative history in its evaluation of the governmental interests advanced there in order to fashion a narrower construction of the law that would be in keeping with Congression-

---

**9.** It should be noted that the Michigan Supreme Court has upheld an $1,000 threshold expense

limit in that state's lobbying law. *Advisory Opinion on 1975 PA 227, supra.*

al motives, the Court did not weigh the documented need for the law in the balance.

By the same token, the plaintiffs' reliance on the case of *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), as upholding a "*Harriss* standard" for the amount of legislative history required to pass a law affecting First Amendment rights, is similarly misplaced. In that case the Court struck down a Massachusetts law that *prohibited* corporations and banks from expending money for the purpose of influencing the voting public in state referenda. Such a thorough abridgement of fundamental constitutional rights, directed at the plaintiffs' "pure speech" must withstand the strictest scrutiny.

The *Bellotti* court found that the arguments advanced by Massachusetts in support of this legislation, i.e., sustaining the role of the individual in the electoral process by prohibiting corporate speech, preventing the risk of corruption, and protecting shareholders from supporting speech that they may not agree with, were neither inherently persuasive, supported by precedent, *nor* supported by the legislative record. *Id.* at 789–90, 98 S.Ct. at 1422–23. There is no indication that if the arguments advanced in support of the law had been inherently persuasive, or supported by precedent, the Court would have felt required to search through the legislative history to evaluate whether the state had put forth enough "facts" to justify passage of the legislation. What standards would be applied? How many instances of "lobbying abuses" would be sufficient to justify the passage of the law?

 This Court finds that the interests advanced here in support of the New York lobby law are inherently persuasive and supported by court precedents as enunciated in *United States v. Harriss, supra*; and *Buckley v. Valeo, supra*.

**6.** *Lobby Disclosure Laws in Other States.*

This Court is convinced that the New York lobby law compares favorably with other state laws regarding lobby disclosure. The Washington Supreme Court has upheld a lobby disclosure that is similar to the New York scheme. *Fritz v. Gorton*, 83 Wash.2d 275, 517 P.2d 911 (1974); *Young Americans for Freedom, Inc. v. Gorton*, 83 Wash.2d 728, 522 P.2d 189 (1974). In the *Young Americans* case the court held that the plaintiffs' argument that the law would apply to every lobbying contact, no matter how remote, was a "strained" interpretation of the Washington statutory scheme. *Id.* at 732, 522 P.2d 191. The court interpreted the act in keeping with the *Harriss* case. In evaluating the governmental interests advanced by the legislation, the court stated,

> Informed as to the identity of the principal of a lobbyist, the members of the legislature, other public officials, and also the public may more accurately evaluate the pressures to which public officials are subjected. Forewarned of the principals behind proposed legislation, the legislator and others may appropriately evaluate their sales pitch.

*Fritz v. Gorton, supra* 83 Wash.2d at 305, 517 P.2d at 929. The court held that this purpose outweighed the constitutional interests advanced by the plaintiffs.

The California Supreme Court upheld the California lobby law[10] in *Fair Political Practices Comm'n v. Superior Court, supra*. That court held that even though the disclosure provisions constitute an interference with fundamental constitutional rights, disclosure provisions that are concerned only with the reporting of lobbying receipts and expenditures do not "substantially interfere with the ability of the lobbyist to raise his voice." 25 Cal.3d at 47, 599 P.2d at 54, 157 Cal.Rptr. at 863. The court went on to state that requiring a person engaged in a business to describe it and report its re-

**10.** The California lobby law also prohibits lobbyists from making a contribution to a state candidate.

ceipts and expenses cannot be viewed as a substantial impediment to engaging in that business. *Id.*

In *New Jersey State Chamber of Commerce v. New Jersey Election Law Enforcement Comm'n, supra,* the court upheld that portion of the New Jersey Campaign Contributions and Expenditures Reporting Act related to lobbying after narrowing the construction of the statute.[11] The court held that "[t]he reporting act, as herein construed does not invade First Amendment rights because it does not cover individuals who are not meaningfully implicated in influencing the legislative process." *Id.* at 85, 411 A.2d at 182.

The Michigan Supreme Court has also upheld a lobby disclosure in *Advisory Opinion on 1975 PA 227, supra.* The law is very similar to the New York legislation in that the Michigan law goes to the limits of the *Harriss* definition of lobbying, covers administrative action, and has an $1,000 threshold expense reporting limitation. The court upheld this legislation because "both the electorate and public officials have a right to be informed of those interests represented by lobbyists." *Id.* at 513, 242 N.W.2d at 23.

A Connecticut statute has, however, been rejected by a district court in this circuit. *Moffet v. Killian, supra.* That legislation imposed a registration fee on lobbyists. The court held that a tax on the exercise of constitutional rights could not be countenanced. The court held, however, that the state was empowered to require lobbyists to disclose their sources, income and expenses.[12] The New York legislation at issue

in the present case merely requires disclosure.

The Court believes that this law is not overbroad.

### 7. Summary Judgment.

■ The Court having treated all of the plaintiffs' arguments regarding the alleged overbreadth, finds that plaintiffs are not entitled to summary judgment. Although the defendants have not made a cross motion for summary judgment, the Court believes that the record is adequate regarding the constitutional question presented. Since there is no disputed issue of material fact, the Court may grant judgment for the non-moving party. 6 Moore's Federal Practice, ¶ 56.12 (2d Ed. 1976) *See, e.g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Bd. of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). There are several examples of a *sua sponte* award of summary judgment in this circuit. *Morrissey v. Curran,* 423 F.2d 393, 399 (2d Cir.) *cert. denied* 399 U.S. 928, 90 S.Ct. 2245, 26 L.Ed.2d 796, *cert. denied sub nom Segal v. Morrissey,* 400 U.S. 826, 91 S.Ct. 52, 27 L.Ed.2d 56 (1970); *Local 33, Int'l Hod Carriers Union,* 291 F.2d 496, 505 (2d Cir. 1961); *Lowenschuss v. Kane, supra* 520 F.2d at 261. *See also, Doe v. United States Civil Service Comm'n,* 483 F.Supp. 539 (S.D.N.Y. 1980); *Moss v. Ward,* 450 F.Supp. 591 (W.D. N.Y.1978); *Petroleo Brasileiro SA, Petrolras v. American Oil Corp.,* 372 F.Supp. 503 (S.D.N.Y.1974).

---

11. The Court held that the $100 expense threshold was too low. The New Jersey Court, since it is a state court, has the power to authoritatively construe the provisions of state law. *Gooding v. Wilson, supra; United States v. Thirty-Seven Photographs, supra; NYCLU v. Acito, supra.* The federal court does not have the authority to limit the reach of a state statute in the way a state court may limit a state statute. A federal court may, as in the instant case, decide that a state statute is fairly susceptible to a constitutional interpretation. *Zwickler v. Koota, supra* 389 U.S. at 251, 88 S.Ct. 391.

12. The Supreme Court has recently held that a California ordinance which places a $250 limitation on contributions to committees formed to support or oppose ballot measure is unconstitutional. The Court stated that

> Placing limits on contributions which in turn limit expenditures plainly impairs freedom of expression. *The integrity of the political system will be adequately protected if contributors are identified in a public filing revealing the amounts contributed. . . .*

*Id.* —— U.S. at ——, 102 S.Ct. at 438. (emphasis supplied).

This Court is satisfied that, based on the parties' affidavits and exhibits, the defendants are entitled to summary judgment on the plaintiffs' overbreadth claim.

## IV.

## VAGUENESS

Plaintiffs urge that the lobby law is unconstitutionally vague. Statutes involving criminal penalties will be struck down under the vagueness doctrine if men of ordinary intelligence are unable to evaluate what conduct is allowable under the law. *Buckley v. Valeo*, 424 U.S. at 40–41, 96 S.Ct. at 645. *See also, Hynes v. Mayor and Council of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972); *United States v. Harriss, supra; Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

The vagueness doctrine is closely related to the overbreadth doctrine and the two are often spoken of together. *See, e.g., Dombrowski v. Pfister*, 380 U.S. at 486, 85 S.Ct. at 1121; *Keyshian v. Bd. of Regents*, 385 U.S. at 609, 87 S.Ct. at 687. This doctrine is based upon the rationale that, because First Amendment rights need breathing space to survive, a statute must have ascertainable standards of guilt so that persons will not be chilled in their exercise of constitutional rights because of their fear of criminal sanctions. *NAACP v. Button*, 371 U.S. at 433, 83 S.Ct. at 338; *Cantwell v. Connecticut*, 310 U.S. 296, 301, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940).

Much of the plaintiffs' argument concerning vagueness depends upon their expansive reading of what activity constitutes lobbying. If this Court found that the lobby law was designed to reach *any* sort of indirect activity which might ultimately impact upon the governmental decision-making process, the Court would agree that it would be too difficult for average citizens to evaluate their conduct in light of

this statute. Since, as illustrated by the foregoing discussion in Part III of this opinion, both the legislative history and the defendant Commission's interpretation of the law indicates that a person or entity, acting on another's behalf, is obliged to comply with this law only if there is direct contact with governmental decision-makers, or a campaign to encourage the public to engage in direct contact, the vagueness argument regarding this law's application to any remote indirect activity to influence legislation fails.

Plaintiffs also contend that, as interpreted, the act is vague in light of the Commission's opinion regarding the lobbying aspects of a response to a government decision-maker's request for information. (Plaintiffs' Exhibit "W", Opinion # 79–2). In this opinion, the Commission stated that responses to government officials' requests for information are not lobbying unless the respondent's submission goes beyond the requested information, and presents the information in an attempt to influence legislation or agency rule on behalf of a client. Such responses could also be termed lobbying if the respondent asked the official to request the information. Plaintiffs claim that this interpretation renders the law too vague in that respondents might be considered lobbyists based upon the sentence structure of their responses.

The Court concedes that a person or entity responding to such a request on behalf of another would have to do some weighing as to whether their response would be considered lobbying by the Commission. This is true of all types of disclosure laws. A statute need not be so elaborate as to cover every *conceivable* set of circumstances that may arise under it. *See, e.g., United States v. Harriss, supra; State v. Hoebel*, 256 Wis. 549, 41 N.W.2d 865 (1950); *Garcia, Validity and Construction of State and Municipal Enactments Regarding Lobbying*, 42 A.L.R.3d 1046 (1972 & 1980 Supp.).

Plaintiffs also argue that this law is impermissibly vague because it requires the apportionment of all general office over-

head expenditures. Plaintiffs contend that it is too difficult to obtain an accurate accounting of overhead expenses such as utilities, rent and office equipment. Since there are criminal penalties for failure to disclose lobby expenses, plaintiffs believe that the law unnecessarily chills the exercise of their First Amendment rights by, in effect, forcing them to forego lobbying activities for fear that they cannot compile an accurate statement. However, the defendant Commission has held that general office overhead is not a reportable lobby expense (Defendants' Exhibit "3" attached to Motion to Dismiss).

In conclusion, the Court holds that this law is not impermissibly vague given the limited definition of "lobbyist" and "lobby expense". Therefore, the plaintiff is not entitled to summary judgment on this claim. The Court has considered the affidavits and exhibits regarding this question and decides that the defendant is entitled to summary judgment on this claim in accordance with the authority previously cited in Part III(7) of this opinion.

## V.

## EQUAL PROTECTION

Plaintiffs' final claim is that this law violates the equal protection clause of the Fourteenth Amendment by classifying independent colleges who engage in direct contact with legislators and administrative agencies as lobbyists while exempting their counterparts at SUNY and CUNY because they are state universities.

The Fourteenth Amendment guarantee of equal protection is designed to ensure that persons similarly situated are treated equally in terms of benefits conferred or duties imposed. *Zablocki v. Redhail, supra; Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Chicago v. Mosley*, 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). The traditional standard of review employed by the courts is whether the law in question is wholly arbitrary or without a

rational basis. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 457, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981); *Vance v. Bradley*, 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); *New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). When fundamental constitutional rights are involved, however, it is necessary to find a compelling state interest to validate the law making the classification. *Illinois State Bd. of Election v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979); *American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); *San Antonio School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16, *rehearing denied*, 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

Since this legislation places a burden upon the rights of speech and petition under the First Amendment the state must come forth with a compelling state interest to justify the differentiation. The state has indicated that the legislature based this differing treatment on the fact that state agencies must comply with strict budgetary controls, therefore, the amount of money that the state and city universities spend to influence governmental action is already disclosed to the government and the public. (Russell Affidavit ¶ 37, Defendants' Brief, 21). The plaintiffs, however, have attempted to discover how much money has been spent by SUNY and CUNY for such activities, and has been unsuccessful (Plaintiffs' Exhibits, "G", "O", "P" and "U"). The response of the state to their inquiries has been that since SUNY and CUNY do not engage in lobbying as defined in the law there is no budgetary item labelled "lobbying". (Plaintiffs' Exhibits "P" and "G"). Plaintiffs have also attached a SUNY publication which speaks of SUNY's "lobbying" efforts. (Plaintiffs' Exhibit "A" attached to Lavery affidavit).

If SUNY and CUNY have a budget for lobbying activities, but call the activities something else, *e.g.*, governmental relations, and such information is available to the government and the public, the exemption for SUNY and CUNY is valid under the Fourteenth Amendment. Whether SUNY and CUNY's budget actually reflects this is disputed in the affidavits. Since there is a question of fact in this regard summary judgment on this claim is inappropriate at the present time.

## VI.

## CONCLUSION

The Court makes the following rulings in regard to the instant motions:

1. Defendants' motion to dismiss under Rule 12(b)(6) is denied;

2. Plaintiffs' motion for summary judgment under Rule 56 is hereby:

a. denied as to plaintiffs' overbreadth claim; summary judgment is entered for the defendants on this claim;

b. denied as to plaintiffs' vagueness claim; summary judgment is entered for the defendants on this claim; and

c. denied without prejudice as to plaintiffs' equal protection claim on the ground that at this stage of the litigation there is a genuine issue of material fact regarding this claim.

IT IS SO ORDERED.