United States Court of Appeals,

Eleventh Circuit.

No. 95-2555.

FLORIDA LEAGUE OF PROFESSIONAL LOBBYISTS, INC., Plaintiff-Appellant,

v.

William N. MEGGS, as State Attorney for the Second Judicial Circuit of Florida, Defendant-Appellee.

July 9, 1996.

Appeal from the United States District Court for the Northern District of Florida. (No. 93-CV-40277), Maurice Mithcell Paul, Chief Judge.

Before EDMONDSON and DUBINA, Circuit Judges, and LOGAN[*], Senior Circuit Judge.

EDMONDSON, Circuit Judge:

Florida, like every other state in the union,[1] has enacted legislation regulating the conduct of those who "lobby" the state's legislative or executive officials. This appeal requires us to determine whether Chap. 93-121, Laws of Florida, is unconstitutional so far as it requires extensive disclosure by lobbyists and their principals and bars lobbyists from receiving fees contingent on their success in affecting legislative or executive outcomes. We hold that Florida's disclosure requirements survive the facial challenge that Appellant brings today. And, we uphold the ban on contingency-fee lobbying despite whatever doubts

---

[*]Honorable James K. Logan, Senior U.S. Circuit Judge for the Tenth Circuit, sitting by designation.

[1]See Steven Browne, Note, *The Constitutionality of Lobby Reform:  Implicating Associational Privacy and the Right to Petition the Government,* 4 Wm. & Mary Bill Rts. J. 717 (1995) (observing that all fifty states have statutes regulating lobbying).

recent cases may have cast on its constitutionality.  About the contingency fee, we deem ourselves to be bound by some old pronouncements of the Supreme Court;  and we lack the power to overrule these pronouncements, even if more recent cases suggest that the Supreme Court might someday reach a result contrary to the one we reach today.

I.

Appellant is an organization of professional lobbyists.  The lobbyist-members contend the disclosure and contingency-fee provisions of the statute violate their constitutional rights and assert that they fear imminent reprisal.

The legislation challenged here, Chapter 93-121 of the Laws of Florida, amended the provisions of Fla.Stats. §§ 11.045 and 112.3215.  Those provisions define "Lobbying," "Lobbyist," and "Principal."  As amended, the sections provide that a lobbyist hired by a principal shall disclose all lobbying expenditures, whether made by the lobbyist *or* by the principal, and the source of funds for all such expenditures.  *See id.* § 11.045(3)(a).  In addition, the statute requires disclosure of expenditures by category, and provides a non-exclusive list of categories:  "food and beverages, entertainment, research, communication, media advertising, publications, travel, and lodging." *Id.* Furthermore, the Florida legislature has provided for an administrative procedure, so that persons in doubt about the precise operation of the statute may, in writing, seek clarification of the intended reach of the statutes.  *Id.* § 11.045(4).  As noted, the statute also precludes would-be lobbyists from exchanging their services

for an award contingent on legislative outcome. *See id.* § 11.047.

The League does not argue that the statute has been unconstitutionally applied to penalize its members. And, from the record, nothing indicates that any member of the League has requested an advisory opinion as provided for in the statute. The only contentions are that the statute is overbroad and, therefore, facially invalid in its disclosure provisions and that the contingency-fee ban is unconstitutional in the light of recent Supreme Court precedent. After the parties proffered extensive documentary evidence, the district court granted summary judgment in favor of the state.

## II.

If the League is correct that the greater number of this statute's applications are unconstitutional, then its members face an unattractive set of options if they are barred from bringing a facial challenge: refrain from engaging in protected First Amendment activity or risk civil sanction for alleged unethical conduct. Therefore, this action is ripe; and the League has standing to bring it, even though it makes no allegation that its members have actually been sanctioned. *See generally Abbott Lab. v. Gardner,* 387 U.S. 136, 152-53, 87 S.Ct. 1507, 1517-18, 18 L.Ed.2d 681 (1967) (holding that action was ripe before prosecution occurred where appellants faced choice between complying with possibly void regulation and risking "serious" civil penalties). Thus, we address the constitutional challenge even in the absence of concrete indicators on how it will be applied.

We do not say that the absence of allegations of prosecutions

under the Act is irrelevant to our disposition of this case. Because Appellant has failed to allege a specific unconstitutional application, its challenge must be characterized as a facial—as distinct from as-applied—challenge. This characterization requires Appellant to meet a higher burden because, as the Supreme Court has indicated, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully...." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987) (holding Bail Reform Act of 1984 not facially invalid).

Some disagreement has appeared lately among members of the Supreme Court on exactly how high the threshold for facial invalidation should be set. As we understand it, some Justices interpret Supreme Court precedent to indicate that a statute is not facially invalid unless there is *no* set of circumstances in which it would operate constitutionally; others contend the cases require only that a statute would operate unconstitutionally in *most* cases. *Compare Janklow v. Planned Parenthood,* --- U.S. ----, ---- & n. 1, 116 S.Ct. 1582, 1583 & n. 1, 134 L.Ed.2d 679 (1996) (Mem.) (Stevens, J.) (asserting that statute is facially invalid if unconstitutional in large fraction of cases) *with id.* at ----, 116 S.Ct. at 1586 (Scalia, J., dissenting from the denial of certiorari) (statute is facially invalid only if it would never operate constitutionally).[2] But, because we conclude (below) that

---

[2]Also, we note that this case is a First Amendment case, where because of the overbreadth doctrine, facial challenges may succeed more often. *See New York v. Ferber,* 458 U.S. 747, 767-74, 102 S.Ct. 3348, 3360-63, 73 L.Ed.2d 1113 (1982); *see also Salerno,* 481 U.S. at 744-45, 107 S.Ct. at 2100.

Appellant has failed to show that the Florida lobbying amendments would operate unconstitutionally often enough to satisfy *either* test, we can safely conclude that this facial challenge fails.

### III.

Within the framework of the facial challenge, we measure the Act against the appropriate First Amendment standard. In defining that standard, we turn first to *United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954), where the Supreme Court upheld the Federal Regulation of Lobbying Act against a First Amendment challenge. The Court construed that Act as addressing only face-to-face, "direct" contact between lobbyists and officials. (As discussed above, the language of the Florida statute seems to sweep somewhat more broadly, bringing more "indirect" lobbying, such as research and media campaigns, within its scope.)

In *Harriss,* the Supreme Court was not explicit about the level of constitutional scrutiny applied. It appears, however, that the Court did not subject the lobbying restrictions to the demands of strict scrutiny. Instead, the Court satisfied itself that the government had asserted sufficient interests—specifically, "maintain[ing] the integrity of a basic governmental process," 347 U.S. at 625, 74 S.Ct. at 816, and preserving to Congress "the power of self-protection." *Id.* Having recognized these interests, the Court rejected the facial challenge, stating that the appellants' predictions of constitutional infringement amounted to "hypothetical borderline situations," and identifying as "too remote" the possibility that persons would engage in substantial

self-censorship. *Id.*

In *Minnesota State Ethical Practices v. Nat'l Rifle Ass'n,* 761 F.2d 509, 512 (8th Cir.1985), the court looked to *Harriss* in upholding a statute similar in operation to the one challenged here. The Eighth Circuit read *Harriss* as demonstrating broad approval for lobbying restrictions. *See Minnesota State Ethical Practices,* 761 F.2d at 512. The regulations approved in *Minnesota State Ethical Practices* were considerably broader than those in *Harriss,* extending to internal communication among members of an organization as well as to "direct" contacts with legislators.

Several other courts have similarly interpreted *Harriss* and have rejected broad constitutional attacks on lobbying disclosure requirements. In *Fair Political Practices Comm'n v. Superior Ct. of Los Angeles,* 25 Cal.3d 33, 157 Cal.Rptr. 855, 863-64, 599 P.2d 46, 54 (1979), the court concluded that under *Harriss,* "[a]pplication of the burdens of registration and disclosure of receipts and expenditures to lobbyists does not substantially interfere with the ability of the lobbyist to raise his voice." The court, therefore, declined to apply strict scrutiny to, and ultimately sustained, the registration and expenditure-reporting requirements. *Id. See also Commission on Indep. Colleges & Univs. v. New York Temporary State Comm'n on Reg'n of Lobbying,* 534 F.Supp. 489, 497 (N.D.N.Y.1982) (upholding New York lobbying statute); *ACLU v. New Jersey Election Law Enforcement Comm'n,* 509 F.Supp. 1123, 1130 (D.N.J.1981) (upholding lobbyist disclosure provisions of New Jersey statute); *Fritz v. Gorton,* 83 Wash.2d 275, 517 P.2d 911, 931-32, *appeal dismissed,* 417 U.S. 902, 94 S.Ct.

2596, 41 L.Ed.2d 208 (1974) (upholding disclosure requirements of Washington state lobbying initiative). *But cf. Fair Political Practices,* 157 Cal.Rptr. at 863-64, 599 P.2d at 54 (striking "transaction reporting requirements" of California statute, which required reporting of "lobbyist and employer transactions with others, which may be entirely unrelated to lobbyist activities").

## IV.

Against the standard of *Harriss* and its progeny, we are unpersuaded that a substantial number of the applications of Chapter 93-121 will offend the First Amendment. So, we reject the facial challenge.

The League contends that the First Amendment demands strict scrutiny of the reporting requirements. Thus, in the League's estimation, the law is overbroad and facially invalid to the extent the state cannot show both a compelling interest in its ends and that the statute is narrowly tailored to avoid undue interference with the exercise of legitimate speech rights. The League concludes that the statute is not narrowly tailored to the extent it requires reporting of "indirect expenses when there is no direct contact with governmental officials." In the light of the case law summarized above, we disagree.

The League concedes, as it must, that the state has articulated legitimate interests. The Supreme Court has made clear that circumstances like these implicate the correlative interests of voters (in appraising the integrity and performance of officeholders and candidates, in view of the pressures they face) and legislators (in "self-protection" in the face of coordinated

pressure campaigns). *See, e.g., McIntyre v. Ohio Elections Comm'n,* --- U.S. ----, ----, 115 S.Ct. 1511, 1519, 131 L.Ed.2d 426 (1995) ("In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation."); *Buckley v. Valeo,* 424 U.S. 1, 67, 96 S.Ct. 612, 657, 46 L.Ed.2d 659 (1976) (discussing governmental interest in "alert[ing] the voter to the interests to which a candidate is most likely to be responsive and thus facilitat[ing] predictions of future performance in office"); *Harriss,* 347 U.S. at 625, 74 S.Ct. at 816 ("Congress, at least within the bounds of the Act as we have construed it, is not constitutionally forbidden to require the disclosure of lobbying activities. To do so would be to deny Congress in large measure the power of self-protection.").

And, these interests continue to apply when the pressures to be evaluated by voters and government officials are "indirect" rather than "direct." *See Minnesota State Ethical Practices,* 761 F.2d at 512-513 (recognizing state interest in applying reporting requirements to intra-organization "lobbying" activity not involving direct contact with government officials). In fact, the government interest in providing the means to evaluate these pressures may in some ways be stronger when the pressures are indirect, because then they are harder to identify without the aid of disclosure requirements. *Harriss* appears to have acknowledged as much when, even reading the statute narrowly to apply only to "direct communication," it nonetheless defined direct communication

to include "artificially stimulated letter campaign[s]." *Harriss,* 347 U.S. at 620, 74 S.Ct. at 813.

Because the interests of the state of Florida are compelling, the facial challenge can succeed only if the League has shown that a substantial fraction of the applications of the challenged law will fail to further these articulated interests. On the record before us, we conclude that the League cannot satisfy this burden. We reach this conclusion in the light of both *Harriss* 's notation that mail campaign expenses may be required to be reported and the reasoning of *Minnesota State Ethical Practices,* which we find persuasive; these sources strongly indicate that the First Amendment permits required reporting of considerably more than face-to-face contact with government officials.

As for the League's hypothesized, fact-specific worst-case scenarios, we also decline to accept the facial challenge based on these perceived problems. The League suggests, for example, that the state may begin applying the expense reporting requirements against editorial writers who urge a legislative result, simply because the journalists are employed by corporate structures that employ lobbyists for totally unrelated reasons. The Supreme Court in *Harriss* discounted similar "hypothetical borderline situations." *Harriss,* 347 U.S. at 626, 74 S.Ct. at 816. For now, we discount them here also.

V.

Therefore, we decline to validate the facial challenge.[3] But,

---

[3]One commentator has suggested that two interests in particular are served by sparing use of the power to void a statute on its face, both of which interests are applicable in

in the future courts can, to the extent necessary, evaluate the statute's constitutionality as-applied.  They can also sever those parts of the statute, if any, that factual development shows can never be applied constitutionally.  *See, e.g., Harriss,* 347 U.S. at 627, 74 S.Ct. at 817 (noting, in upholding statute against facial challenge, that act contained severability clause that could be used to remedy later problems).  But, we now see no indication that part of this statute must fall to preserve its constitutionality; and, therefore, we decline to strike any provision.  We, however, express no opinion on the constitutionality of particular fact-based challenges that may arise in the future.  We just conclude that the district court committed no error of law in denying relief to the Plaintiff on its facial challenge to the lobbying disclosure requirements.

VI.

Appellant also argues that the First Amendment bars the prohibition on the receipt of fees contingent on the passage of favorable legislation.  The League relies chiefly on  *Meyer v. Grant,* 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988), in which the Court subjected to "exacting scrutiny" and struck down a state statute prohibiting payment of fees to petition circulators, and on *Riley v. Nat'l Fed'n of the Blind,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), in which the Court again struck down

this case.  These interests are, first, in restraining the power of the judiciary to interfere with the prerogatives of the political branches of government and, second, in ensuring that the courts are confronted with concrete facts, thereby reducing the rate of error in constitutional decisionmaking.  *See* Michael C. Dorf, *Facial Challenges to State and Federal Statutes,* 46 Stan.L.Rev. 235, 245-46 (1994).

a state statute under the heightened First Amendment standard, this one a prohibition on the receipt of "unreasonable" fees by professional fundraisers working for charitable organizations.

Florida points out that in cases decided well before the articulation of "exacting scrutiny," the Supreme Court specifically held that contracts to lobby for a legislative result, with the fee contingent on a favorable legislative outcome, were void *ab initio* as against public policy: *Hazelton v. Sheckels,* 202 U.S. 71, 78, 26 S.Ct. 567, 568, 50 L.Ed. 939 (1906), and *Providence Tool Co. v. Norris,* 69 U.S. (2 Wall.) 45, 55, 17 L.Ed. 868 (1864).[4] The League does not contest the applicability of these older decisions to this case. And, we are persuaded that these decisions permit a legislature to prohibit contingent compensation. The League, however, suggested at argument that the extensive, interim developments of First Amendment law establish conclusively that the Supreme Court today would strike a contingency-fee ban on

---

[4]For example, in *Norris,* a case involving a contract to lobby for contracts with the Department of War, the Court wrote:

> Legislation should be prompted solely from considerations of the public good.... Agreements for compensation contingent upon success, suggest the use of sinister and corrupt means for the accomplishment of the end desired. The law meets the suggestion of evil, and strikes down the contract from its inception.

69 U.S. (2 Wall.) at 55. The Court also noted that "[t]here is no real difference in principle between agreements to procure favors from legislative bodies, and agreements to procure favors in the shape of contracts from the heads of departments." *Id.* In *Hazelton,* Justice Holmes held invalid an agreement to pay an individual a sum equal to the excess of the dollar amount of a desired government contract over a set amount. 202 U.S. at 78, 26 S.Ct. at 568.

lobbying.[5]

This prediction may be accurate, but we are not at liberty to disregard binding case law that is so closely on point and has been only weakened, rather than directly overruled, by the Supreme Court. The Court instructed, in *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 482-86, 109 S.Ct. 1917, 1921-22, 104 L.Ed.2d 526 (1989), that Courts of Appeals should continue to follow directly applicable precedent that rests on reasoning seemingly rejected in analogous cases, "leaving to this Court the prerogative of overruling its own decisions." *Id.* We take this admonition to heart, and we decline to take any step which might appear to overrule *Norris* and *Hazelton.*

Therefore, the decision of the district court is AFFIRMED.

AFFIRMED.

---

[5]Some support for this argument appears in the decision of the Montana Supreme Court in *Montana Auto. Ass'n v. Greely,* 193 Mont. 378, 632 P.2d 300, 308 (1981), which struck down a ban on contingency-fee lobbying as overbroad.