# Illinois Official Reports

## Appellate Court

---

### *Kane v. Option Care Enterprises, Inc.*, 2021 IL App (1st) 200666

---

| | |
|---|---|
| Appellate Court Caption | JAMES H. KANE, d/b/a Kane & Co., Plaintiff-Appellant, v. OPTION CARE ENTERPRISES, INC, a Delaware Corporation, Defendant-Appellee. |
| District & No. | First District, Third Division<br>No. 1-20-0666 |
| Filed<br>Rehearing denied | September 8, 2021<br>October 15, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2016-L-10989; the Hon. Patrick J. Sherlock, Judge, presiding. |
| Judgment | Circuit court affirmed; motion taken with the case denied. |
| Counsel on Appeal | James H. Kane, of Kane & Co., of Chicago, for appellant.<br><br>Nicholas Anaclerio and Joshua J. Orewiler, of Vedder Price P.C., of Chicago, for appellee. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Justices Howse and Burke concurred in the judgment and opinion. |

¶ 1    Attorney James H. Kane, doing business as Kane & Co. (Kane), brought claims of breach of contract and *quantum meruit* against Option Care Enterprises, Inc. (Option Care), seeking $764,762 in compensation for services he provided pursuant to a contingency fee contract to "evaluate and negotiate tax credits and other federal, state, and local level incentives" from Illinois and Wisconsin "government officials." The trial court granted summary judgment in favor of Option Care after finding that the agreement between Kane and Option Care was unenforceable as a matter of public policy because it provided for contingency fee lobbying in violation of section 8 of the Lobbyist Registration Act (Act) (25 ILCS 170/8 (West 2014)) and because enforcement of the contract was barred, recovery under the equitable theory of *quantum meruit* was also barred. From that judgment, Kane appeals, arguing that his contract with Option Care is enforceable because it did not expressly obligate him to contravene the statute. Kane also argues that we need not consider which government official(s) he actually communicated with; enforcing the contract would be consistent with various public policies, such as the policy of allowing parties to freely contract; the legislature did not intend that a statutory violation would void the contract; and severability language allows for the fee clause to be stricken so that Kane can be otherwise fairly compensated for services rendered. Kane also argues his *quantum meruit* count is viable.

¶ 2    We first confirm our jurisdiction. The trial court granted Option Care's motion for summary judgment as to Kane's claims on October 7, 2019, Kane filed a motion to reconsider on November 6, 2019, and the court denied Kane's motion on March 3, 2020. Kane then filed a notice of appeal on April 30, 2020. Kane's notice of appeal was timely, and we have jurisdiction over his appeal, due to a combination of Rules 301 and 303, which govern appeals from final judgments of the circuit court in civil cases, and a supreme court order issued on March 24, 2020, which doubled the normal 30-day period to appeal in light of what were then ongoing health concerns caused by COVID-19. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. Jan. 1, 2015); Ill. S. Ct., M.R. 30370 (eff. Mar. 24, 2020).

¶ 3    In a motion taken with the case, Kane argues that the supplemental statement of facts that Option Care included in its appellate response brief should be stricken because it is not fair, accurate, or neutral. We deny the motion. We have simply disregarded the occasional statements in the parties' briefs that do not comply with the briefing rules. *John Crane Inc. v. Admiral Insurance Co.*, 391 Ill. App. 3d 693, 698, 910 N.E.2d 1168, 1174 (2009); Ill. S. Ct. R. 341(h)(6), (i) (eff. Oct. 1, 2020) (rules regarding briefs filed by the appellant and appellee).

¶ 4    Option Care is a Delaware corporation whose principal place of business is in Illinois. Kane has been a licensed Illinois attorney since 1988. In June 2015, Kane, doing business as Kane & Co., met with Option Care representatives and then sent an engagement letter proposing that he "evaluate and negotiate tax credits and other federal, state and local level incentives in Illinois and Wisconsin for [Option Care] to consider in making [its] final investment and hiring location decisions." Option Care executed Kane's contract. Kane had attached a "biography" indicating that he "specializes in assisting owners of large, complex properties effectively manage their state and local tax burden" and has "assisted many clients with securing lucrative government incentives." Kane's contract outlined a four-phase timeline for him to "identify potential incentive opportunities, quantify the anticipated benefits, and negotiate and perfect the state incentives":

"Phase I: Strategic Assessment

Gather and analyze information related to investment and job creation opportunities.

Initiate preliminary incentive negotiation discussions with state and local government officials.

Identify the steps required to obtain the identified incentives.

Quantify an estimated range of monetary value of the benefits available to the Company for each incentive.

Phase II: Negotiation

Design, develop, and execute an overall negotiation strategy for obtaining the incentives identified in Phase I.

Gather additional project information and review development plans and other activities that may generate incentives.

Arrange and attend meetings with the government officials to commence the negotiation process.

Negotiate the incentive package with government officials.

Secure incentive proposals from state officials.

Phase III: Implementation

Preparation of required applications, agreements, statements, reports, etc. to obtain the incentives.

Attend planning sessions and public meetings with government agencies (if any).

Obtain final approval of the incentives and credits.

Secure the incentives that have been negotiated with the government agencies.

Phase IV: Maintenance & Monitoring

Once the incentives have been secured, Kane & Co. will assist Client by creating a compliance timeline to help Client monetize the incentives.

We will provide Client personnel with a binder to establish the compliance procedures necessary under an agreement or contract to continue receiving the incentives ('knowledge transfer')."

¶ 5    Kane's letter offered three payment options. Option Care elected Option B, which stated:

"Our professional fees will be based upon 15 percent of the benefits reasonably anticipated to be achieved at the time of the incentive award, plus out of pocket expenses. The fee will be payable in two installments: 50 percent (50%) upon receipt of an incentive offer and the remaining fifty percent (50%) due at knowledge transfer. Out-of-pocket expenses will be billed monthly, as incurred."

¶ 6    Kane sued Option Care in November 2016. In his first amended complaint, Kane alleged that after the parties signed the contract, he "[g]athered and analyzed information related to investment and job creation opportunities," "[i]nitiated preliminary incentive negotiation discussions with state and local government officials," "executed an overall negotiation strategy for obtaining the incentives," and "[a]rranged and attended meetings with the government officials." After that, Kane had "[n]egotiated the incentive package with government officials," "[s]ecured incentive proposals from state officials," and followed

through with applications to obtain the incentives for Option Care. Due to Kane's actions, the Illinois Department of Commerce and Economic Opportunity (DCEO) had approved Option Care's application for an "EDGE" tax credit on November 18, 2015, and Option Care was granted a $5.1 million incentive award by the State of Illinois. (The parties use "EDGE" as an anacronym for the Economic Development for a Growing Economy Tax Credit Act, which authorized tax credits to medium and large-sized corporations to locate and expand their plants and facilities in Illinois. 35 ILCS 10/5-3 (West 2014) (purpose of the statute).On December 15, 2015, and January 11, 2016, Kane sent invoices for the first and second installments of the total due for the six months of services he provided pursuant to the engagement letter. Option Care had declined to pay.

¶ 7        Kane and Option Care filed cross-motions for partial summary judgment, which the trial court denied. Kane's motion included an affidavit specifying how he fulfilled the contract. Option Care later used Kane's affidavit to support a "renewed" motion for summary judgment against Kane's first amended complaint. This is the summary judgment ruling we have been asked to review. Kane swore in part that he (1) negotiated with "Vic Narusis, Director, [DCEO], to secure the EDGE Tax Credit Agreement;" (2) fulfilled the obligation to "[a]rrange and attend meetings with the government officials to commence the negotiation process," including through "numerous phone calls and in-person meetings, as well as indirect communications to make sure [that then Illinois] Governor [Bruce] Rauner's Administration was aware of the importance of incentives to the ultimate location decision;" and (3) "helped develop a strategy to attempt to mitigate the impact of a Governor[-] imposed 'moratorium' on new EDGE Tax Credit awards *** [that] required [Kane]to draft a letter to the Director of the [DCEO], to be signed by [Option Care's] CFO."

¶ 8        The trial court granted summary judgment to Option Care on Kane's breach of contract count, after finding that Kane had not alleged the threshold requirement of a valid and enforceable contract and instead based his claim on a lobbying agreement that was prohibited by statute and unenforceable as a matter of public policy. The trial court's reason for granting summary judgment as to Kane's *quantum meruit* count was that where enforcement of an illegal contract is sought, a court should leave the parties where they have placed themselves, rather than effectively enforcing an unlawful bargain under a different legal theory. Kane brought this appeal after the trial court denied his motion to reconsider entering summary judgment. The trial court did not reach Option Care's motion to strike as untimely the documents that Kane attached to his motion for reconsideration.

¶ 9        In keeping with the principle of freedom to contract, courts are hesitant to declare contracts void as contrary to public policy. *H&M Commercial Driver Leasing, Inc. v. Fox Valley Containers, Inc.*, 209 Ill. 2d 52, 57, 805 N.E.2d 1177, 1180 (2004). Courts take this step only as to contracts that are " 'clearly contrary to what the constitution, the statutes, or the decisions of the courts have declared to be the public policy or unless they be manifestly injurious to the public welfare.' " *H&M Commercial*, 209 Ill. 2d at 57 (quoting *Schumann-Heink v. Folsom*, 328 Ill. 321, 330, 159 N.E. 250, 254 (1927)). Whether a contract should be deemed contrary to public policy depends on the peculiar facts and circumstances of that case. *H&M Commercial*, 209 Ill. 2d at 57. This presents a question of law, which we review *de novo*. *County of Jackson v. Mediacom Illinois, LLC*, 2012 IL App (5th) 110350, ¶ 10, 972 N.E.2d 738. The *de novo* standard is also controlling because we are reviewing the entry of summary judgment. *Founders Insurance Co. v. American Country Insurance Co.*, 366 Ill. App. 3d 64,

70, 851 N.E.2d 120, 126 (2006). Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018).

¶ 10    There are constitutional rights to "petition the government for a redress of grievances" (U.S. Const., amend. I; Ill. Const. 1970, art. I, § 6 (right to assemble and petition)), but there is also long-standing precedent that precludes compensating lobbyists on a contingent basis to obtain legislative or administrative action. Even when there is no evidence that impropriety has occurred, contingent-fee lobbying arrangements are condemned because of their tendency to promote impropriety. *E.g.*, *Marshall v. Baltimore & Ohio R.R. Co.*, 57 U.S. (16 How.) 314, 336 (1853) (As to lobbying state legislators on behalf of rail company seeking right of way through Virginia, "The sum of these cases is—1st. That all contracts for a contingent compensation for obtaining legislation, or to use personal or any secret or sinister influence on legislators, is void by the policy of the law."); *Tool Co. v. Norris*, 69 U.S. (2 Wall.) 45, 49 (1864) (With respect to lobbying to sell 25,000 muskets to the United States, "all agreements for pecuniary considerations to control the business operations of the Government, or the regular administration of justice, or the appointments to public offices, or the ordinary course of legislation, are void as against public policy, without reference to the question, whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements; and it closes the door to temptation, by refusing them recognition in any of the courts of the country."); *Trist v. Child*, 88 U.S. 441, 452 (1875) (Contract for purely professional services such as drafting a claim was valid until it was blended with an agreement to personally influence members of Congress to approve the claim, and the court remarked: "We are aware of no case in English or American jurisprudence like the one here under consideration, where the [entire] agreement has not been adjudged to be illegal and void."); see also 51 Am. Jur. 2d *Lobbying* § 4 (2021) (contingent fee agreements for "procuring or influencing legislative action *** furnish the strongest incentive to the exertion of corrupting and sinister influences to the end that the desired legislation be secured," and are "void as against public policy"); William M. Howard, Annotation, 35 A.L.R.6th § 1 *Validity, Construction, and Application of State and Municipal Enactments Regulating Lobbying and of Lobbying Contracts* (2008) (traditionally, lobbyists have been regulated through contract law limiting the validity or enforcement of contracts to influence legislation).

¶ 11    In the modern era, individual states have banned contingent fee arrangements with lobbyists. See Vincent R. Johnson, *Regulating Lobbyists: Law, Ethics, and Public Policy*, 16 Cornell J.L. & Pub. Pol'y 1, 39 (2006) (most states prohibit the payment of fees contingent upon the outcome of legislation or administrative action). See, *e.g.*, *Florida League of Professional Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 458 (11th Cir. 1996) (first amendment allows states to prohibit lobbyists from receiving contingency fees that are contingent upon affecting legislative or executive outcomes); *Bereano v. State Ethics Comm'n*, 944 A.2d 538 (Md. 2008) (regarding lobbyist's 10-month suspension by Maryland ethics commission upon finding that his compensation was contingent upon executive or legislative action). *Cf. Montana Automobile Ass'n v. Greely*, 632 P.2d 300, 308 (Mont. 1981) ("The blanket prohibition against contingent compensation of lobbyists provided by section 9 is overbroad because it precludes contingent fee agreements that are properly motivated as well as those that are improperly motivated.").

¶ 12    The ruling on appeal is based on the Illinois law, which provides:

"§ 8. Contingent fees prohibited.

No person shall retain or employ another to lobby with respect to any legislative, executive, or administrative action for compensation contingent in whole or in part upon the outcome of the action and no person shall accept any such employment or render any such service for compensation contingent upon the outcome of the legislative, executive, or administrative action." 25 ILCS 170/8 (West 2014).

¶ 13    The statute's encompassment of "*any* legislative, executive, or administrative action" (emphasis added) (25 ILCS 170/8 (West 2014)) is broader than the prior version of the law applied in *Rome* that was specific to legislation and/or the governor's approval or veto of legislation:

" 'Contingent fees prohibited. No person shall retain or employ another to promote or oppose legislation for compensation contingent in whole or in part upon the passage or defeat of any legislation, or the approval or veto of any legislation by the Governor, and no person shall accept any such employment or render any such service for compensation contingent upon the passage or defeat of any legislation or the approval or veto of any legislation by the Governor.' (25 ILCS 170/8 (West 1992))." (Emphasis omitted.) *Rome v. Upton*, 271 Ill. App. 3d 517, 520, 648 N.E.2d 1085, 1088 (1995).

¶ 14    The plaintiff in that case, James Rome, was hired to secure public financing for the Montrose Harbor Apartments Project. *Rome*, 271 Ill. App. 3d at 517. He contracted to assemble his clients' application, make presentations to municipal agencies and legislators, " 'shepherd[ ] environmental review through to completion,' " respond to government inquiries about the application, provide additional documentation and clarifications, and attend meetings necessary to garner the funds. *Rome*, 271 Ill. App. 3d at 518. These tasks were described as "SERVICES" rather than lobbying. *Rome*, 271 Ill. App. 3d at 518. The contract stated Rome would be compensated by a $5000 retainer and a percentage of whatever public financing he obtained. *Rome*, 271 Ill. App. 3d at 518.

¶ 15    After Chicago's city council passed an ordinance authorizing revenue bonds and a loan of municipal funds to benefit the apartment project, Rome's clients refused to pay him, contending his tasks were to lobby and that their contingent fee agreement was void. *Rome*, 271 Ill. App. 3d at 517. In his breach of contract suit, Rome submitted a sworn statement indicating that he was not a lobbyist and that except for one meeting with a Chicago alderman to "explain the project and answer questions about it," Rome had not "ever communicat[ed] with any elected official of the City of Chicago with regard to any matters set forth in the Agreement." (Internal quotation marks omitted.) *Rome*, 271 Ill. App. 3d at 519.

¶ 16    Citing the Illinois statutory ban and precedent on contingent fee lobbying, the court held that Rome's contract was void for public policy reasons because of its tendency to encourage the use of improper means to influence the legislature. *Rome*, 271 Ill. App. 3d at 521. The promise of a contingent fee " 'is a direct and strong incentive to the exertion of not merely personal but sinister influence.' " *Rome*, 271 Ill. App. 3d at 521 (quoting *In re Browning*, 23 Ill. 2d 483, 494, 179 N.E.2d 14, 19 (1961)). The court rejected arguments that Rome's contract did not expressly contemplate the use of improper means such as personal influence or that Rome had performed in good faith, noting that the "tendency" rationale applies in all instances to void the agreement, regardless of the circumstances. *Rome*, 271 Ill. App. 3d at 521. " 'It matters not that nothing improper was done or was designed to be done by the plaintiff. It is

enough that such is the tendency of the contract ***.' " (Emphasis omitted.) *Rome*, 271 Ill. App. 3d at 521 (quoting *Crichfield v. Bermudez Asphalt Paving Co.*, 174 Ill. 466, 482, 51 N.E.2d 552, 557 (1898)). The court stated, "We would not expect a party to announce its contemplation or use of 'sinister influences' against public bodies." *Rome*, 271 Ill. App. 3d at 521.

¶ 17    *Rome* and the precedent the court discussed were prominent in the summary judgment ruling against Kane regarding his claims to spearhead the pursuit of State tax credits and other incentives for Option Care as it relocated and/or expanded its operations.

¶ 18    Kane argues that his contract did not violate the statute because it did not "expressly require" him to "lobby," or "communicate with state officials as [the term 'official' is] defined by subsection 2(c)" of the statute. See 25 ILCS 170/2(c) (West 2014). The "Definitions" section of the statute provides:

> "(c) 'Official' means:
>
> (1) the Governor, Lieutenant Governor, Secretary of State, Attorney General, State Treasurer, and State Comptroller;
>
> (2) Chiefs of Staff for officials described in item (1);
>
> (3) Cabinet members of any elected constitutional officer, including Directors, Assistant Directors and Chief Legal Counsel or General Counsel;
>
> (4) Members of the General Assembly; and
>
> (5) Members of any board, commission, authority, or task force of the State authorized or created by State law or by executive order of the Governor." 25 ILCS 170/2 (West 2014).

¶ 19    According to Kane, his contract indicated he would "use his professional experience and qualifications to determine which tax credits *** [Option Care] might be eligible for, and might obtain." Kane is thus implying that he functioned as an advisor to Option Care rather than as its lobbyist. He contrasts this supposed role with a lobbyist's tasks of lobbying and communicating with legislators; emphasizes that the contract did not specify he would influence legislative, executive or administrative action; and argues his fee "was not contingent upon the outcome of any legislative, executive or administrative action."

¶ 20    He also contends that courts "have not generally considered the parties' performance of [their] contract" when determining whether their agreement violates public policy, but in this instance, the ruling is based on how he performed his end of his bargain with Option Care. Kane is addressing the fact that he detailed his services in his affidavit in support of his motion for summary judgment as to Option Care's liability for payment.

¶ 21    Contrary to Kane's appellate argument, he swore that in fulfillment of his contractual duty to "[a]rrange and attend meetings with the government officials to commence the negotiation process," (1) he had "numerous phone calls and in-person meetings, as well as indirect communications to make sure [that then Illinois] Governor [Bruce] Rauner's Administration was aware of the importance of incentives to the ultimate location decision" and (2) he also negotiated with the "Director" of a specific Illinois agency, DCEO, "to secure the EDGE Tax Credit Agreement" on Option Care's behalf. After the court entered summary judgment against Kane, he filed a motion for reconsideration which contradicted this affidavit.

¶ 22    In our opinion, the meaning of the parties' contract is clear, and Kane's description of it is incorrect and unpersuasive. Kane is downplaying the nature of the services he agreed to

provide. It is disingenuous of him to suggest that he contracted to function as an advisor on the sidelines while Option Care sought tax credits, deductions, and other incentives. Kane agreed to engage in certain activities in order to obtain the desired financial outcome for Option Care and earn any compensation for his efforts. He was required to "attend meetings with," "negotiate" with, and "secure incentive proposals from" government and/or state "officials." Then he was required to "[s]ecure the incentives that have been negotiated with the government agencies" and "perfect" a state incentive award. These are obligations to communicate with "officials" in order to influence them to his client's advantage. This is lobbying within the meaning of the statute. Section 2(e) of the statute broadly defines "lobby" and "lobbying" as "*any communication* with an official of the executive or legislative branch of State government as defined in subsection (c) for the ultimate purpose of *influencing any* executive, legislative, or *administrative action*." (Emphases added.) 25 ILCS 170/2(e) (West 2014). In turn, section 2(f) defines "influencing" as "*any communication*, action, reportable expenditure as prescribed in Section 6 or other means used *to promote, support, affect*, modify, oppose or delay *any* executive, legislative or *administrative action* or to promote goodwill with officials as defined in subsection (c)." (Emphases added.) 25 ILCS 170/2(f) (West 2014). The statutory term "executive action" used in section 2(f) is defined in section 2(g) as: "the proposal, drafting, development, *consideration*, amendment, *adoption*, approval, promulgation, issuance, modification, rejection or postponement by a State entity *of a* rule, regulation, order, *decision, determination, contractual arrangement*, purchasing agreement or other quasi-legislative or quasi-judicial action or proceeding." (Emphases added.) 25 ILCS 170/2(g) (West 2014). The statutory term "administrative action" used in section 2(f) is defined in section 2(i) as: "*the execution or rejection of any* rule, regulation, legislative rule, standard, fee, rate, *contractual arrangement*, purchasing agreement or other *delegated legislative or quasi-legislative action to be taken or withheld by any* executive agency, *department*, board or commission of the State." (Emphases added.) 25 ILCS 170/2(i) (West 2014). Kane contracted to do more than just advise Option Care about which tax credits it might obtain for itself. Ultimately, Kane had to favorably influence Illinois "officials" and "government agencies" in order to earn any compensation whatsoever.

¶ 23     We are not won over by Kane's argument that he was not expressly required to "communicate with state officials as [the term 'official' is] defined by subsection 2(c)" of the statute. See 25 ILCS 170/2(c) (West 2014). According to *Rome*, it was unnecessary for the contract to expressly forecast Kane's intention to contravene the law. Kane's contractual obligations to obtain tax advantages for Option Care were more detailed than lobbyist Rome's general contractual duties to perfect public financing for the Montrose Harbor Apartment Project. *Rome*, 271 Ill. App. 3d at 517. In the "Strategic Assessment" portion of the relationship known as "Phase I," Kane was supposed to "[i]nitiate preliminary incentive negotiation discussions with state and local government officials." In "Phase II: Strategic Negotiation," Kane's tasks were to "[d]esign, develop, and execute an overall negotiation strategy for obtaining the incentives identified in Phase I"; "[a]rrange and attend meetings with the government officials to commence the negotiation process"; "[n]egotiate the incentive package with government officials"; and "[s]ecure incentive proposals from state officials." In the next phase, "Implementation," Kane would undertake "[p]reparation of required applications, agreements, statements, reports, etc. to obtain the incentives"; "[a]ttend planning sessions and public meetings with government agencies (if any)"; "[o]btain final approval [from the

- 8 -

unspecified government officials and agencies who control the] *** incentives and credits";
and "[s]ecure the incentives that have been negotiated with the government agencies."

¶ 24    Rome's services did not expressly include lobbying or negotiating. See *Rome*, 271 Ill. App.
3d at 518. However, after the court applied the tendency rationale, it declined to enforce what
was a contingent fee arrangement to lobby for favorable legislation. *Rome*, 271 Ill. App. 3d at
521. As we set out above, the tendency rationale has been applied to cases like this since at
least the mid-nineteenth century. The General Assembly has signaled that the tendency of the
parties' arrangement continues to be an appropriate consideration at this time because it did
not revise the statute to correct *Rome*'s interpretation in 1995. *United States v. Glispie*, 2020
IL 125483, ¶ 10 (the legislature is presumed to know how courts have interpreted a statute and
may amend a statute if it intended a different construction). The legislature made minor
statutory changes that took effect in 2009, 2010, 2014, and 2019, and none of these revisions
abrogated or replaced the well-established standard. See Pub. Act 96-555, § 65 (eff. Aug. 18,
2009); Pub. Act 96-1358, § 10 (eff. July 28, 2010); Pub. Act 98-459, § 5 (eff. Jan. 1, 2014);
Pub. Act 101-595, § 5 (eff. Dec. 5, 2019). It was unnecessary for Kane's written agreement to
state the name, title, or level of any particular State government official in order to be rendered
unenforceable by the contingency fee statute. See *Rome*, 271 Ill. App. 3d at 521 ("We would
not expect a party to announce its contemplation or use of 'sinister influences' against public
bodies."). The fact that the contract indicated Kane would be communicating with "officials"
on Option Care's behalf and would be compensated on a contingent basis for the government
incentives he secured from those "officials" is what brought the agreement within the purview
of the statute. It was the possibility or tendency of violating the statute that brought the contract
within the statute. *Rome* instructs that the law looks to " 'the tendency of the contract' " rather
than to what was " 'designed to be done by the plaintiff' " or what was actually done by the
plaintiff. (Emphasis omitted.) *Rome*, 271 Ill. App. 3d at 521 (quoting *Crichfield*, 174 Ill. at
482). "It matters not that nothing improper was done or was designed to be done by the
plaintiff." (Emphasis and internal quotation marks omitted.) *Rome*, 271 Ill. App. 3d at 521.
Kane worked pursuant to an executed agreement that placed no limitation on his efforts to
influence Illinois officials on Option Care's behalf. He agreed to lobby on a contingent basis
without any terms restricting with whom he contacted, met, or negotiated in Illinois
government. This meant that in "Phase II: Strategic Negotiation" and "Phase III:
Implementation," Kane was incentivized to reach as high as he could reach in Illinois
government to secure the largest financial benefit for Option Care, earn a percentage of that
deal, and be paid anything at all. This was clearly the tendency of the agreement.

¶ 25    However, even without this line of precedent—even without the tendency rationale—Kane
conceded that he communicated with at least one of the government employees described in
the statute's definitions section. Kane's affidavit specified that he negotiated with "Vic
Narusis, Director, [DCEO] to secure the EDGE Tax Credit Agreement" for Option Care. An
agency "Director" is one of the "Officials" listed in section 2(c) of the statute. 25 ILCS 170/2
(West 2014). Thus, Kane acknowledged that he violated the statute that prohibited him from
"accept[ing] any such [lobbying] employment or render[ing] any such [lobbying] service for
compensation contingent upon the outcome of the legislative, executive, or administrative
action." 25 ILCS 170/8 (West 2014).

¶ 26    Kane's attempt to contradict his statement with a different affidavit attached to his motion
for reconsideration was ineffective. Kane's first affidavit was a judicial admission and was

- 9 -

binding. *Capital One Bank, N.A. v. Czekala*, 379 Ill. App. 3d 737, 744, 884 N.E.2d 1205, 1212-13 (2008). Furthermore, the reconsideration process was not an opportunity for Kane to research and gather "emails and DCEO organizational charts" that supposedly corrected his misapprehension and affidavit that he had discussions with an agency director in order to secure financial advantages for Option Care. Motions for reconsideration have very limited purposes that do not include disputing one's own evidence. See *Xiao Ling Peng v. Nardi*, 2017 IL App (1st) 170155, ¶ 30, 163 N.E.3d 133 (purpose of a motion to reconsider is to bring the court's attention to (1) error in the court's previous application of the law, (2) changes in the law, or (3) newly discovered evidence that was not available at the time of the first hearing).

¶ 27    In addition, Kane swore that while working under the written agreement he had initiated or accepted "numerous phone calls and in-person meetings, as well as indirect communications to make sure [that the governor's office] was aware of the importance of incentives to [Option Care's] ultimate location decision." Kane's affidavit did not disclose the name or title of any person in the administration. Under *Rome* and the tendency rationale that court applied, it was unnecessary for Kane to provide a sworn statement identifying who he attempted to influence in the highest state executive office while he was working for a fee that depended entirely upon his success.

¶ 28    Kane's two billing statements to Option Care were further indications that he had entered into an unenforceable contingency fee contract to lobby. Kane's billing statements dated December 15, 2015, and January 1, 2016, each sought payment for "extensive negotiation" services he rendered pursuant to the contract. In each document, Kane sought 50% of the total $764,762 that he calculated he had earned based on the results of his work:

> "Fees for professional services rendered *pursuant to [the] engagement letter* dated June 2, 2015. *Services included research, consultation and extensive negotiations with state and local officials in Illinois* and Wisconsin for two site selection projects for a new Corporate Headquarters and the Reimbursement Center. Kane & Co. secured incentive offers from the Wisconsin Economic Development Corporation and the Illinois Department of Commerce of Economic Opportunity, and had ongoing discussions with [various municipalities in Illinois and Wisconsin]. Pursuant to [the] engagement letter, the professional service fees are based upon '15 percent of the benefits reasonably anticipated to be achieved at the time of the incentive award, plus out of pocket expenses. The fee will be payable in two installments; 50 percent (50%) upon receipt of an incentive offer and the remaining fifty percent (50%) due at knowledge transfer.' " (Emphases added.)

¶ 29    Whether we focus on what the written contract forecast or focus on what Kane invoiced for, alleged in his first amended complaint and swore had occurred in his performance of the contract, the record indicates that his contingency fee agreement for lobbying was not enforceable due to the statute. The law prohibited Option Care from hiring a lobbyist whose compensation was contingent upon his or her success and it prohibited Kane from accepting a lobbying assignment under which his compensation was contingent upon his success. Again, the law stated:

> "§ 8. Contingent fees prohibited.
>
> No person shall retain or employ another to lobby with respect to any legislative, executive, or administrative action for compensation contingent in whole or in part upon the outcome of the action and no person shall accept any such employment or

render any such service for compensation contingent upon the outcome of the legislative, executive, or administrative action." 25 ILCS 170/8 (West 2014).

¶ 30 We also reject Kane's mischaracterization of *McCracken & McCracken, P.C. v. Haegele*, 248 Ill. App. 3d 553, 618 N.E.2d 577 (1993), as being "much more factually similar" than *Rome* and therefore controlling of this appeal. The plaintiff in *McCracken* was a law firm hired to institute proceedings before the Cook County Assessor, disputing the most recent tax valuation of the client's hotel property in Franklin Park, Illinois. *McCracken*, 248 Ill. App. 3d at 555. The law firm filed a complaint and succeeded in reducing the tax bill. *McCracken*, 248 Ill. App. 3d at 555. When the client refused to pay the firm a percentage of the tax reduction and the firm filed suit, the client argued in part that the fee agreement was unenforceable as a matter of public policy because excessive legal fees are prohibited by a rule of professional conduct. *McCracken*, 248 Ill. App. 3d at 560. The firm then tendered a motion *in limine* to bar any evidence regarding the reasonableness of the fee agreement, maintaining that the contract was negotiated and executed at arm's length and that the fee terms were unambiguous and the amount reasonable. *McCracken*, 248 Ill. App. 3d at 557. The trial judge found the contract was " 'between two adults,' " and granted the firm's motion *in limine*. *McCracken*, 248 Ill. App. 3d at 557.

¶ 31 The appellate court ruled that the judge erred in granting the motion *in limine* and should have considered evidence concerning the reasonableness of the fee. *McCracken*, 248 Ill. App. 3d at 561. The case was remanded for a reasonableness hearing. *McCracken*, 248 Ill. App. 3d at 561. The appellate court's decision was based on the rule of professional conduct and precedent regarding exorbitant attorney fees. That court did not consider precedent regarding contingent fee lobbying agreements. The court did not contemplate the statute currently at issue. In our opinion, the law firm that agreed to litigate property taxes and wound up in a dispute about whether its litigation fee was earned is not like Rome and Kane, the two lawyers who agreed to navigate political channels and wound up in disputes about whether their compensation clauses were prohibited by the lobbying statute. Citing *McCracken* does not support Kane's appeal.

¶ 32 Furthermore, we reject Kane's contention that the parties' contract is not manifestly injurious to the public welfare or so capable of producing harm that it should not be enforced. He contends that enforcement of the parties' contract actually favors the public policies of allowing parties the freedom to contract, affordable access to attorneys and the court system, and economic development. This is not a persuasive argument because Kane fails to cite any statutory language or precedent that would permit an exception to the broadly worded prohibition on contingency fees for lobbying. We decline to analyze this argument further. Failure to support a contention with relevant authority results in waiver of the argument. *Cholipski v. Bovis Lend Lease, Inc.*, 2014 IL App (1st) 132842, ¶ 53, 16 N.E.3d 345.

¶ 33 We need not address Kane's argument that even "if this Court finds that the fee provision of the parties' contract did violate the [statute], the contract should still be enforced based on *K. Miller Construction Co. v. McGinnis*, 238 Ill. 2d 284 (2010)." Arguments that have not been raised in the trial court are forfeited and cannot be raised for the first time on appeal. *K&K Iron Works, Inc. v. Marc Realty, LLC*, 2014 IL App (1st) 133688, ¶ 25, 21 N.E.3d 1190. Kane contends that this is not a new argument and directs our attention to certain pages of the record, but those pages actually concern whether Kane's *quantum meruit* count would become viable

if the contract was not enforceable, and they contain no citation to *K. Miller Construction* or a discussion of the legal principle at issue there.

¶ 34    Kane's last argument before addressing his *quantum meruit* claim is that the trial court should have enforced the contract's two severability clauses. The first clause appeared immediately after the contingent fee language (in the same paragraph):

> "In the event a federal, state or local law prohibits a contingent fee for a particular program, the Client agrees to negotiate in good faith with Kane & Co. to determine a fair fee for the services rendered, based upon a variety of factors including time incurred, value of services, etc."

¶ 35    The other severability clause was printed on a separate page entitled "GENERAL BUSINESS TERMS" that Kane included with his engagement letter:

> "K. Governing Law and Severability. *** If any provision of this engagement letter (or any portion thereof) is found by a court of competent jurisdiction to violate any statute, regulation, rule, order or decree of any governmental authority, court, agency or exchange, or is determined to be invalid or unenforceable, such invalidity shall not be deemed to affect any other provision hereof or the validity of the remainder of this engagement letter or these Business Terms, and such invalid provision shall be deemed deleted herefrom to the minimum extent necessary to cure such violation. The remaining provisions of this engagement letter and Business Terms shall not be affected by such determination and shall be binding upon the parties and shall be enforceable as though said invalid or unenforceable provision (or portion thereof) were not contained herein."

¶ 36    Citing the Restatement (Second) of Contracts § 184(1) (1981), both Kane and Option Care contend that the question is whether the contingent fee term that is unenforceable as a matter of public policy is an essential part of the agreed exchange. Whether the unenforceable term is an essential part of the contract depends upon its relative importance in the overall agreement. Restatement (Second) of Contracts § 184 cmt. a (1981).

> " '[C]omplex, multipart agreements on which there may have been significant reliance should not be void as a whole solely because some small part is against public policy' [citation] because, absent great inequality or misconduct involving an essential term of the contract, doing so would frustrate the contractual expectations of the parties." *VG Marina Management Corp. v. Wiener*, 378 Ill. App. 3d 887, 895-96, 882 N.E.2d 196, 204 (2008) (quoting *People v. McNett*, 361 Ill. App. 3d 444, 448, 837 N.E.2d 461, 465 (2005)).

Kane states that he did not engage in any misconduct to obtain Option Care's agreement to the contingency fee clause and, without citing any authority, contends there is a strong judicial preference for enforcing the remaining portions of the contract. Option Care responds that Illinois courts do not enforce the rest of a contract when the offensive portion is a term as essential as payment. Option Care is correct.

¶ 37    *Kepple & Co. v. Cardiac, Thoracic & Endovascular Therapies, S.C.*, 396 Ill. App. 3d 1061, 1066, 920 N.E.2d 1189 (2009), concerned a contract to perform medical billing and collection services for a percentage of the amount collected. The fee-sharing clause was unenforceable because it violated the fee-sharing prohibition of the Medical Practice Act of 1987. *Kepple*, 396 Ill. App. 3d at 1061 (citing 225 ILCS 60/22(A)(14) (West 2008)). The court held: "Since

the unenforceable fee-sharing clause is an essential part of the services contract, the remaining provisions of the services contract are not severable from that unenforceable provision and the entire contract *** is void and unenforceable." *Kepple*, 396 Ill. App. 3d at 1066. The court affirmed summary judgment against the billing and collection agency's claim for breach of the services contract. Also, in *Practice Management Ltd. v. Schwartz*, 256 Ill. App. 3d 949, 954, 628 N.E.2d 656, 659 (1993), the court determined that a prohibited fee-splitting clause for optometric patient referrals could not be severed from a contract regarding legitimate management services "because the method for payment of these services is improper."

¶ 38    These Illinois cases are remarkably similar to the case that we are addressing. They leave no question about retaining Kane's severability clause. The essence of the parties' agreement was lobbying Illinois government in exchange for a percentage of the financial benefit the lobbying achieved. Since the unenforceable contingency fee clause is an essential part of the lobbying contract, the remaining provisions of the contract are not severable from the whole, and the whole is void. Retaining Kane's severability clause would undermine the statute, or as the trial court put it, Kane would be given "an end run around the prohibitions in the [statute] to protect the public good."

¶ 39    Having considered the record, the law, and all of Kane's arguments, we find the trial court was correct in concluding that Option Care was entitled to summary judgment as to Kane's breach of contract claim because Kane could not meet the threshold requirement of a valid, enforceable agreement.

¶ 40    Our last consideration is whether Kane's *quantum meruit* claim for the reasonable value of his services can stand. Count I of the first amended complaint contained Kane's breach of contract claim, and count II contained his alternative theory of *quantum meruit*. In English, *quantum meruit* means " 'as much as he deserves.' " *Much Shelist Freed Denenberg & Ament P.C. v. Lison*, 297 Ill. App. 3d 375, 378, 696 N.E.2d 1196, 1199 (1998) (quoting *First National Bank v. Malpractice Research, Inc.*, 179 Ill. 2d 353, 365, 688 N.E.2d 1179, 1185 (1997)). "*Quantum meruit* is based on the implied promise of a recipient for services to pay for valuable services because otherwise the recipient would be unjustly enriched." *Much Shelist*, 297 Ill. App. 3d at 379. To recover under *quantum meruit*, the plaintiff must prove (1) the plaintiff performed a service to benefit the defendant, (2) the plaintiff did not perform this service gratuitously, (3) the defendant accepted this service, and (4) no contract existed to prescribe payment for this service. *Canel & Hale, Ltd. v. Tobin*, 304 Ill. App. 3d 906, 913, 710 N.E.2d 861, 868 (1999).

¶ 41    Kane argues that the trial court erred by relying on a case that is limited to its particular facts, *Malpractice Research*, 179 Ill. 2d 353. Option Care responds that *Malpractice Research* is but one of numerous Illinois cases indicating that a party may not recover indirectly under *quantum meruit* funds he is barred from recovering directly under an unlawful contract. We agree with Option Care.

¶ 42    In *Malpractice Research*, medical malpractice plaintiffs brought a declaratory judgment action to invalidate their contingent fee agreement with a medical-legal consulting firm they hired to choose and retain expert witnesses to support their claims. *Malpractice Research*, 179 Ill. 2d at 355. The firm counterclaimed under both breach of contract and *quantum meruit*. *Malpractice Research*, 179 Ill. 2d at 355-56. The trial court invalidated the contingent fee contract on public policy grounds but awarded the firm *quantum meruit* fees. *Malpractice Research*, 179 Ill. 2d at 357-58. The appellate court held that the contingent fee contract was

- 13 -

enforceable. *Malpractice Research*, 179 Ill. 2d at 358. The supreme court held, however, that the contract was unenforceable and that the *quantum meruit* theory was also unsustainable. *Malpractice Research*, 179 Ill. 2d at 358. The supreme court's holding required the simplest of explanations: "invalidity of the contract now precludes the [firm] from obtaining relief on a *quantum meruit* theory for work it performed in furtherance of the agreement." *Malpractice Research*, 179 Ill. 2d at 366.

¶ 43        Similarly, in *Practice Management*, 256 Ill. App. 3d at 955 (which we cited above in rejecting Kane's severability clauses), the court determined that because a contract violated the Medical Practice Act's prohibition of fee sharing with non-physicians (225 ILCS 60/22(A)(14) (West 1992)), the theory of *quantum meruit* theory would not be used to reward the plaintiff for services furnished under an illegal agreement. *Practice Management*, 256 Ill. App. 3d at 953.

¶ 44        *Cheevers v. Stone*, 10 Ill. App. 2d 39, 45-46, 134 N.E.2d 32, 36 (1956), is another illustration of this principle. The plaintiff in that case was a nonattorney who contracted to provide legal and other services in the construction of a public garage and later brought claims of breach of contract and *quantum meruit*. *Cheevers*, 10 Ill. App. 2d at 41. That court reasoned: "[T]his contract has been adjudged to be illegal. The services performed were thus illegal and the unenforceable nature of an illegal, executed contract cannot be circumvented by disregarding the express contract and suing for the reasonable value of such illegal services." *Cheevers*, 10 Ill. App. 2d at 45.

¶ 45        Any one of these cases support our determination that where the underlying contract is unenforceable as a matter of public policy, the plaintiff will not be aided in circumventing the contract by recovering under the equitable theory of *quantum meruit*.

¶ 46        Kane's reliance on distinguishable cases is not persuasive. For instance, he cites *Carlton at the Lake Inc. v. Barber*, 401 Ill. App. 3d 528, 533, 928 N.E.2d 1266, 1271 (2010), in which the appellate court held that a long-term care provider could recover in *quantum meruit* against a former resident to whom it had provided services pursuant to a written contract that was not executed by the resident (the family member that admitted him or the long-term care facility itself), as required by the Nursing Home Care Act (210 ILCS 45/1-101 *et seq.* (West 2008)). In allowing *quantum meruit* recovery, the court reasoned that the case involved a situation "where only an issue of *execution* caused the contract to be unenforceable," as opposed to a situation where the subject matter of the contract made it unenforceable. (Emphasis in original.) *Carlton at the Lake*, 401 Ill. App. 3d at 534. In the case at bar, unlike *Carlton at the Lake*, the essential subject matter of the contract—the provision of lobbying services for a contingency fee—directly violates Illinois public policy, rendering the contract unenforceable. Moreover, allowing Carlton at the Lake to pursue *quantum meruit* on remand would not defeat the purposes of the nursing home care statute. "The General Assembly enacted the Act 'amid concern over reports of "inadequate, improper and degrading treatment of patients in nursing homes." ' [Citation.] In this case, there is no assertion that Robert's care at [the] facility was anything other than satisfactory." *Carlton at the Lake*, 401 Ill. App. 3d at 535. In the case at bar, unlike *Carlton at the Lake*, the essential subject matter of the contract—the provision of lobbying services for a contingency fee—directly violates Illinois public policy, rendering Kane's engagement letter unenforceable.

¶ 47        Kane's reliance on *Anderson v. Anchor Organization for Health Maintenance*, 274 Ill. App. 3d 1001, 654 N.E.2d 675 (2005), is misplaced. Unlike the case here, the court addressed

- 14 -

an attorney's entitlement to recover in *quantum meruit* for legal services rendered. The contract did not comply with a statute limiting the percentage of a medical malpractice verdict a lawyer may recover when working on a contingency fee basis absent court approval of additional compensation. *Anderson*, 274 Ill. App. 3d at 1006. In holding that the trial judge had discretion to allow *quantum meruit* recovery, the appellate court differentiated between instances in which contingency fees are outright prohibited, such as criminal and divorce cases, and the statute it was considering, which simply placed a ceiling on the allowable percentage of fees. *Anderson*, 274 Ill. App. 3d at 1006.

¶ 48        In the other case that Kane cites, *Thomas P. Valenti, P.C. v. Swanson*, 294 Ill. App. 3d 492, 690 N.E.2d 1031 (1998), the court allowed an attorney to recover in *quantum meruit* for services provided to a client on a contingency fee basis when the attorney was retained four days after one of the clients was in a car accident and the attorney failed to provide him with a copy of the Personal Injury Representation Agreement Act (815 ILCS 640/0.01 *et seq.* (West 1996)), as required by statute. About eight months later, the clients terminated the representation. *Swanson*, 294 Ill. App. 3d at 493. They later settled their personal injury claim, and the attorney sued them under *quantum meruit* alleging that he provided 28.25 hours of work at $300 per hour. *Swanson*, 294 Ill. App. 3d at 493. After a hearing, the trial judge determined that counsel had proven entitlement to compensation for 14 hours of representation at $225 per hour. *Swanson*, 294 Ill. App. 3d at 493. When the clients appealed, the court looked at the statute's legislative history and noted that the Senate floor debate indicated the statute's purpose was to "discourage 'ambulance chasing' by giving the injured person time to consider his injuries and his options." *Swanson*, 294 Ill. App. 3d at 495. Injured persons should not "hastily enter into personal representation agreements without due consideration of all the relevant facts." *Swanson*, 294 Ill. App. 3d at 495. Those floor debates did not include any discussion of *quantum meruit* or otherwise suggest, however, any legislative intent to preclude an attorney's equitable recovery. *Swanson*, 294 Ill. App. 3d at 495. After further considering the policy behind the statute, the court found that reading a prohibition of *quantum meruit* into the statute would actually lead to absurd results. *Swanson*, 294 Ill. App. 3d at 495. "[P]recluding attorneys from recovering fees for legal services provided within the first 10 days of an injury, a time period in which sound legal advice may be extremely important, would discourage attorneys from providing such services." *Swanson*, 294 Ill. App. 3d at 495. "This result would be contrary to the spirit of the Act." *Swanson*, 294 Ill. App. 3d at 495. In contrast, the statute at issue in Kane's relationship with Option Care is unequivocal and without limitation, contingency fees for lobbying services are prohibited, without exception. Allowing *quantum meruit* recovery for contingent fee lobbying services would undercut the clear purpose of the statute: to prevent even the temptation of corruption polluting governmental action. That temptation is one that inevitably accompanies contingency fee lobbying agreements. See *Rome*, 271 Ill. App. 3d at 520-21.

¶ 49        Accordingly, we hold that the trial court did not err in entering summary judgment in favor of Option Care and against Kane as to *quantum meruit* claim.

¶ 50        For these reasons, the trial court's summary judgment ruling as to Kane's two-count action is affirmed.


¶ 51        Circuit court affirmed; motion taken with the case denied.